KING, Circuit Judge:
These appeals arise from the dismissal of a securities fraud class action complaint in the Eastern District of North Carolina. The action relates to the healthcare provider reimbursement practices of defendant TranS1, Inc., and four officers thereof-defendants Kenneth Reali, Joseph P. Slattery, Richard Randall, and Michael Luetkemeyer (collectively, the "Officers")-in connection with TranS1's AxiaLIF system (the "System"). According to the operative second amended complaint of lead plaintiff Phillip J. Singer (the "Complaint"), TranS1 and the Officers (together, the "Company") conjured up and carried out a scheme that enabled surgeons to utilize the System and secure fraudulent reimbursements from various health insurers and government-funded healthcare programs. The scheme resulted in federal False Claims Act proceedings against TranS1 in the District of Maryland and a fraud investigation conducted by the Department of Health and Human Services (the "DHHS"). On the theory that the Company had concealed the fraudulent reimbursement scheme from the market by way of false and misleading statements and omissions-and that TranS1's stock price dropped precipitously when the scheme was finally revealed-this class action was initiated pursuant to, inter alia, *429 section 10(b) of the Securities Exchange Act.
In dismissing the Complaint with prejudice, the district court concluded that, although the Complaint alleges the loss causation element of the section 10(b) claim, it does not sufficiently plead the material misrepresentation element or the scienter element of that claim. By his appeal (No. 15-2579), Singer seeks reinstatement of the Complaint, contesting the court's rulings on the misrepresentation and scienter elements. TranS1 and the Officers have cross-appealed (No. 16-1019), asserting that the court erred in rejecting their challenge to the loss causation element. As explained herein, we vacate in No. 15-2579 the court's rulings that the Complaint fails to satisfy the misrepresentation and scienter elements, and we affirm in No. 16-1019 the court's ruling that the Complaint sufficiently alleges the loss causation element. Consequently, we remand for further proceedings.
I.
A.
According to the Complaint, TranS1 is a medical device company that first received approval in 2004 to sell the System, which was designed for minimally invasive surgery on the lower lumbar spine to treat degenerative disc disease. See Compl. ¶¶ 2, 25, 27.[1] A System surgery utilizes a "pre-sacral approach"-i.e., the surgery is performed straight up the tailbone, with the patient remaining on her stomach-differentiating it from more common surgeries performed through the anterior portion of the spine. Id. ¶¶ 2, 26. TranS1 derives its revenues almost entirely from sales of the System and related surgical instruments, as well as from a share of the reimbursements made by health insurers and government-funded healthcare programs to surgeons for spinal surgeries using the System. Id. ¶¶ 3, 25. The financial success of the Company largely hinges on surgeons' reimbursement claims being paid, not only because TranS1 receives a share of those reimbursements, but also because, if the reimbursement claims were denied, surgeons "would simply stop utilizing the [System]." Id. ¶ 4.
In this securities fraud class action, the putative class includes those investors in TranS1 who purchased common stock between February 23, 2009, and October 17, 2011-the period in which the Complaint alleges that the Company's fraudulent reimbursement scheme was concealed from the market. See Compl. ¶ 1. Each of the Officers was, in one capacity or another, involved in the management of TranS1 during the relevant time frame.[2]
*430 The Complaint explains that a healthcare provider submitting a reimbursement claim for a surgery is obliged to use Current Procedural Terminology codes ("CPT codes") promulgated by the American Medical Association (the "AMA"). See Compl. ¶ 4. For spinal surgeries, the AMA generally adheres to the coding recommendations provided by the National Association of Spine Surgeons (the "NASS"). Id. The various CPT codes fall into three categories, which are designated as Categories I, II, and III. Only the Category I and Category III codes are relevant here. A Category I code indicates that a surgical procedure is "traditional" and widely accepted in the medical community, assuring a full or substantial reimbursement. Id. ¶ 6. On the other hand, the use of a Category III code reflects that the procedure is "experimental" and not widely accepted. Id. ¶ 5. A Category III code often results in no reimbursement at all, dissuading healthcare providers from performing Category III procedures. Id. ¶ 6.
Relevant here, the System was initially coded as a Category I anterior fusion procedure and thus garnered a full or substantial reimbursement. See Compl. ¶¶ 5, 29. In February 2008, however, the NASS recommended that the coding for the System be changed to Category III, because the System is unlike traditional anterior fusion procedures and "suffered from a dearth of safety and efficacy data."Id. ¶¶ 5, 30.[3] The AMA adopted the NASS recommendation and, effective January 1, 2009, required the System to be coded under Category III. Id.
B.
The Category III coding requirement threatened TranS1's revenue stream and financial viability, in that surgeons could no longer count on reimbursements from health insurers and government-funded healthcare programs for using the System. See Compl. ¶¶ 6, 30. The Complaint alleges that, as a result of the new Category III code, the Company concocted and carried out its multifaceted and sophisticated fraudulent reimbursement scheme. Id. ¶ 7. The crux of that scheme was "to convince surgeons to engage in improper reimbursement practices in direct violation of" various statutes, including the federal False Claims Act. Id. ¶ 31. That is, the Company "encouraged and coached surgeons to utilize alternate codes, instead of the mandated experimental Category III designation assigned to [the System], in order to allow for reimbursement for the procedure." Id.
The Complaint describes the fraudulent reimbursement scheme as it was perpetrated and carried out by the Company. Pursuant to that scheme, the Company on occasion acknowledged the System's new Category III code and some of the difficulty in securing reimbursement for it, but at other times encouraged and instructed surgeons to nevertheless use a Category I code for the System. The fraudulent reimbursement scheme was executed by way of, inter alia, the following:
• The Company formed a reimbursement committee to train surgeons on how to avoid the mandatory Category III code for the System. The head of the committee, a TranS1 employee, gave presentations detailing exactly which non-Category III codes to use and in what manner, and she established a "hotline" for surgeons to call to get coding advice. Pursuant to her instructions, when surgeons did use *431 the Category III code, they were to "bury" it in the reimbursement claim so that the insurer might overlook it. See Compl. ¶¶ 32, 51.
• During conference calls with its third-party product distributors, the Company instructed the distributors to advise surgeons that the System should be coded as a Category I anterior fusion procedure, as it had been prior to the AMA's adoption of the Category III code. In an effort to quell the concerns of surgeons who were aware of the new Category III designation, the Company further advised the distributors to tell such surgeons that "all surgeons" were using a Category I code for the System. Id. ¶¶ 33, 56.
• The Company conducted on-site training sessions designed to encourage surgeons to exchange tips on how to "manipulate" coding to get reimbursed. The most popular site was Cincinnati, Ohio, where TranS1's top consultant gave numerous presentations wherein he coded the System under Category I. Id. ¶¶ 34, 62.
• The Company drafted and distributed a reimbursement guide, dated January 1 through June 30, 2009, for surgeons to use in making successful claims for reimbursement of System surgeries. It was only on the guide's last page that the Company acknowledged the required Category III code for the System and the unlikelihood of reimbursement for Category III procedures. Id. ¶ 35.
• At the behest of the Company, TranS1's top consultant created a template demonstrating how to improperly code the System as a Category I anterior fusion procedure. The template contained suggested post-operation notes meant to disguise the fact that a surgery involved the non-reimbursable System. Id. ¶¶ 36, 63.
• At TranS1's annual national meeting in 2009-attended by many of its employees and executives-the Company promoted the continued use of a Category I code for the System, despite the AMA's mandatory Category III code. The "official company line" to surgeons was, " 'We have a [Category III] code, but here's how other [surgeons] are coding it.' " Id. ¶¶ 37, 64.
The Complaint describes the Company's fraudulent reimbursement scheme-and especially its efforts to have surgeons code the System under Category I, rather than Category III-as "blatant gamesmanship [that] created an acute risk that [TranS1] would be subject to legal action as well as scrutiny by the DHHS and other regulatory bodies." Id. ¶ 38.
C.
1.
After implementing the fraudulent reimbursement scheme, the Company concealed the scheme from the market by numerous false and misleading statements and omissions. See Compl. ¶ 12. The Company specifically failed to disclose, inter alia, that it "engaged in a scheme to encourage surgeons to continue using the [Category I] code for anterior procedures in direct disregard of the AMA's Category III code assignment for [the System]," and that TranS1's "revenues, derived primarily from sales of [the System] as well as a portion of the insurance reimbursement each performing provider received as a result of using improper billing codes for [the System], were generated as a direct result of [the Company's] improper coding scheme." Id.
The Complaint describes various false and misleading statements and omissions *432 of the Company. For example, on February 23, 2009, Officers Randall and Luetkemeyer participated in a conference call with analysts for TranS1's fourth quarter of 2008. See Compl. ¶ 69. During that conference call, without acknowledging the fraudulent reimbursement scheme, Randall stated that the Company was assisting surgeons in obtaining so-called " 'appropriate reimbursement for our procedure.' " Id. Both Randall and Luetkemeyer opined that there would not be " 'any significant additional headwind' " with respect to the new Category III coding requirement for the System. Id. They did not explain that the reason they expected continuing reimbursements was that the Company was coaching surgeons to improperly avoid the mandatory Category III code. Id. ¶ 72.
In the 2008 Form 10-K[4] filed by TranS1 with the Securities and Exchange Commission (the "SEC") on March 13, 2009, TranS1 reported a single source of revenue, i.e., " 'sales of [the System] and related surgical instruments.' " See Compl. ¶¶ 70-71. By that Form 10-K, the Company acknowledged the new Category III code for the System and related that merely " 'some' " health insurers and government-funded healthcare programs " 'may not reimburse' " Category III procedures. Id. ¶ 71. The Company further downplayed the significance of the Category III code by suggesting that the System was gaining in popularity and thus unlikely to carry the Category III code for long. Id. The Company also represented that the Category III code for the System " 'is only one of up to 10 different CPT codes physicians may submit to capture the entirety of a spinal fusion [surgery,] lessening the impact should payment for [the System] be initially denied.' " Id. Meanwhile, the Company omitted the fraudulent coding practices that it advised be utilized and that were then being employed by surgeons to secure reimbursements for the System itself. Id. ¶ 72.
In the subsequent 2009 and 2010 Form 10-Ks and in the various quarterly filings of Form 10-Qs[5] submitted by TranS1 to the SEC, the Company substantially repeated the false and misleading statements and omissions of the 2008 Form 10-K. See Compl. ¶¶ 75-76, 78-79, 81-82, 84-86, 89-90, 92-93, 95-96, 98-100, 102-103, 105-106. Those filings variously touted a growing acceptance of the System among health insurers and providers, see, e.g. , id. ¶¶ 81, 85, 99, and attributed revenue losses to " 'concerns and uncertainty in the marketplace surrounding physician reimbursement for our ... procedure,' " id. ¶¶ 89, 92, 95. Like the 2008 Form 10-K, the subsequent filings with the SEC omitted mention of the Company's reliance on the fraudulent reimbursement scheme to generate the revenues that TranS1 did have. Nevertheless, two or more of the Officers signed each of the Form 10-Ks and Form 10-Qs filed by TranS1 during the relevant timeframe, and two Officers certified " 'that the financial information contained in [each filing] was accurate and that they disclosed any material changes to [TranS1's] internal control over financial reporting.' " Id. ¶¶ 70, 75, 78, 81, 84, 89, 92, 95, 98, 102, 105.
2.
As TranS1 suffered losses from 2009 to 2011, the Company communicated the losses *433 to the market through press releases. See Compl. ¶¶ 73, 77, 80, 83, 87, 91, 94, 97, 101, 104. On April 27, 2009, for example, the Company reported a net loss of $5,000,000 for the first quarter of 2009. Id. ¶ 73. That very day, Officer Randall participated in a conference call where he assured investors that " 'we remain diligent about helping our surgeons obtain appropriate reimbursement for our procedure.' " Id. ¶ 74. Randall cited, for example, the reimbursement committee's "hotline" and the Company's reimbursement guide-without revealing that the Company was instructing surgeons to improperly code the System. Id.
Similarly, on May 4, 2010-after reporting a net loss of $6,000,000 in the first quarter of 2010-Officers Slattery and Reali participated in a conference call with financial analysts. See Compl. ¶¶ 87-88. During that call, Slattery and Reali described a strategy to earn a Category I code for the System by " 'working with the payers to remove our experimental designation over time,' " " 'working with the spine societies to gain endorsement and acceptance of our procedure in a broad manner,' " and " 'working with our physician customers getting further clinical data published and presented at key meetings.' " Id. ¶ 88. Additionally, Slattery falsely asserted that the System's Category III code was " 'not an experimental code,' " but was in fact " 'a tracking code.' " Id. Once again, the Company did not disclose the fraudulent reimbursement scheme it had devised to ensure reimbursements despite the Category III code. Id. ¶ 90.
3.
In sum, none of the Form 10-Ks or Form 10-Qs filed with the SEC, or the various press releases or conference calls, revealed that the Company was "engaged in a scheme to encourage surgeons to employ CPT codes meant for anterior and other non-Category III procedures in direct disregard of the AMA mandated Category III code for [the System]." See Compl. ¶ 72. Nor did any of those SEC submissions or other statements explain that "a substantial portion of [TranS1's] earnings and revenues" were generated by the Company's ongoing fraudulent reimbursement scheme, and that the scheme put TranS1 at "substantial risk" of regulatory scrutiny. Id.
D.
According to the Complaint, the truth about the Company's fraudulent reimbursement scheme finally began to emerge in October 2011. See Compl. ¶¶ 9-10, 108-11. Specifically, after the market closed on October 17, 2011, TranS1 filed a Form 8-K[6] with the SEC, reporting that it had received a subpoena on or about October 6, 2011, issued by the DHHS " 'under the authority of the federal healthcare fraud and false claims statutes.' " Id. ¶ 108. TranS1's Form 8-K explained that the DHHS sought " 'documents for the period January 1, 2008 through October 6, 2011.' " Id. The Complaint alleges that, based on the Form 8-K, the market fully apprehended "that the focus of the subpoena related to [TranS1's] reimbursement practices, given that insurance company reimbursement for [the System], [TranS1's] flagship product, accounted for a majority of its revenue." Id. ¶ 9; see also id. ¶¶ 109-110.
As evidence of the market's realization of the Company's fraudulent reimbursement *434 scheme, the Complaint points to an analyst report issued on October 18, 2011, the day after the revelatory Form 8-K was filed. See Compl. ¶¶ 9, 109. That analyst report revealed factual information about TranS1 and its subpoena from the DHHS, including that the subpoena " 'included 19 items ranging from patient names to serial lot traceability to reimbursement communications with physicians.' " Id. ¶ 109. Additionally, the analyst report revealed the fact that " 'half of TranS1's revenues come from physicians still using [a Category I] code (which provides reimbursement), rather than the designated [Category III] code (which does not provide reimbursement).' " Id.
The analyst report also expressed opinions and beliefs, including that " 'we think that [TranS1] has been making strong efforts to educate physicians about correct coding.' " See Compl. ¶ 109 (noting that "ultimately the decision regarding which code to use lies in the hands of the physician"). Nevertheless, premised on the known facts, the analyst report concluded that TranS1's subpoena from the DHHS " 'could be due to reimbursement communications.' " Id. The analyst report also deduced that, in light of recent downsizing by TranS1, " 'the subpoena could perhaps stem from allegations by a disgruntled former employee.' " Id.
The very day of the analyst report-October 18, 2011-the stock price of TranS1 collapsed, as its "securities plummeted $1.27 or 40.7%, to close at $1.85." See Compl. ¶ 111. The Complaint describes "a massive selloff of [TranS1] shares" and an "unusually heavy trading volume of 2.1 million shares." Id. ¶ 10.
E.
In July 2013, it was publicly confirmed that federal False Claims Act qui tam proceedings relating to the fraudulent reimbursement scheme had been commenced against TranS1 by a former employee in April 2011-six months before TranS1's stock price collapse. See Compl. ¶ 8.[7] In other words, the October 18, 2011 analyst report had "surmised with radar precision that the subpoena [issued to TranS1 in early October 2011 by the DHHS] was triggered by 'allegations by a disgruntled former employee' relating to [TranS1's] illicit 'reimbursement communications.' " Id. ¶ 9. The qui tam action against TranS1 had been initiated by relator Kevin Ryan, a former sales manager for TranS1, in the District of Maryland on April 21, 2011. Id. ¶¶ 8, 39-44. The action was commenced under seal and remained sealed until July 1, 2013. Id. ¶ 8.
The qui tam complaint of April 2011 alleged in detail the fraud scheme being carried out by TranS1 in contravention of the federal False Claims Act, as well as the Medicare Act and the North Carolina False Claims Act. See J.A. 929-64.[8] Similar to the Complaint in these proceedings, the qui tam complaint specified that TranS1 had "knowingly caused to be submitted and facilitated the submission of false and fraudulent claims, statements and/or documents to federal agencies by causing physicians and hospitals to submit improper *435 claims for payment to Medicare and state health insurance programs and insurers." Id. at 930. The qui tam complaint also alleged that, "[t]hrough the use of incorrect and misleading billing and description codes to represent the [System], [TranS1] fraudulently caused hospitals and physicians to obtain and continue to obtain reimbursement from Medicare and the State of North Carolina Health Plan." Id. at 931. The qui tam complaint explained, inter alia, that once the Category III code for the System took effect at the beginning of 2009, the System could "only " be billed as a Category III procedure. Id. at 941. Nevertheless, TranS1 instructed its sales staff and surgeons "to disregard the [Category III code]," as part of "an intentional and systematic effort to bypass the [Category III code] designation and to obtain reimbursement from Medicare and other insurance programs despite the non-reimbursable status of [the System]." Id. at 951.
On June 6, 2013, the United States intervened in the qui tam action for purposes of settlement. By a settlement agreement consummated on June 28, 2013, TranS1 agreed to pay the United States the sum of $6,000,000 to resolve the fraud allegations of the qui tam action with respect to federal government programs. See J.A. 905-28; see also Compl. ¶¶ 11, 46. The settlement agreement included various recitals of the contentions of the United States against TranS1. For example, the United States contended that TranS1 had "knowingly caused providers to submit claims [to publicly funded healthcare programs] for [System] procedures using incorrect diagnosis or procedure codes, ... which in some cases resulted in providers receiving greater reimbursement than that to which they were entitled." See J.A. 906. In entering the settlement agreement, however, TranS1 denied liability and the various contentions of the relator and the United States. Id. at 907.[9]
F.
1.
On January 24, 2012, plaintiff Joel Caplin filed this securities fraud class action against TranS1 and the Officers in the Eastern District of North Carolina. Shortly thereafter, Singer moved for appointment as lead plaintiff. The district court appointed Singer as the lead plaintiff on May 8, 2012, and he filed an amended complaint on July 9, 2012.[10]
In sum, the amended complaint alleged that TranS1 and the Officers violated section 10(b) of the Securities Exchange Act-as well as § 240.10b-5 of Article 17 of the Code of Federal Regulations ("SEC Rule 10b-5")-by concealing the fraudulent reimbursement scheme from the market through false and misleading statements and omissions. According to the amended complaint, the Company thereby artificially inflated TranS1's stock price during the course of the fraudulent reimbursement scheme and injured investors when the scheme was finally revealed to the public and the stock price plummeted. The amended complaint also spelled out a claim against the Officers, under section 20(a) of the Securities Exchange Act, alleging that they were control persons subject to individual liability for TranS1's violation of section 10(b).
*436 On September 7, 2012, the Company moved to dismiss the amended complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995. On September 19, 2013, the district court granted the dismissal motion, focusing on the loss causation element of the section 10(b) claim. See Order, Caplin v. TranS1, Inc. , No. 7:12-cv-00023 (E.D.N.C. Sept. 19, 2013), ECF No. 48. In so ruling, the court recognized that "federal courts have developed two somewhat distinct theories of loss causation: (1) corrective disclosure theory and (2) materialization of a concealed risk." Id. at 13. The court analyzed both theories of loss causation and concluded that the amended complaint had not sufficiently pleaded the loss causation element of the section 10(b) claim under either theory. The court dismissed the amended complaint with prejudice, on the belief that "allowing further amendment would be futile." Id. at 28.
2.
Singer promptly requested the district court to alter or amend its judgment and submitted his second amended complaint, which is now the operative Complaint. Upon reconsideration of its dismissal ruling eight months later, on May 5, 2014, the court changed its earlier ruling and agreed that the Complaint sufficiently pleads the loss causation element of the section 10(b) claim under the materialization of a concealed risk theory. See Order, Singer v. TranS1, Inc. , No. 7:12-cv-00023 (E.D.N.C. May 5, 2014), ECF No. 54 (the "Reconsideration Order"). That Order relied on the Complaint's allegations that the October 18, 2011 decline in TranS1's stock price resulted from the revelation-by way of TranS1's October 17, 2011 Form 8-K, coupled with the October 18, 2011 analyst report-of the Company's long-concealed fraudulent reimbursement scheme. Id. at 12 (explaining that the analyst report, "when considered in conjunction with [TranS1's] disclosure of the subpoena, ... calls into question [TranS1's] prior representations that it was educating physicians about proper coding and reveals to the public, at least in some sense, that [TranS1] was potentially improperly manipulating the insurance reimbursement system").
3.
On July 3, 2014, the Company moved to dismiss the Complaint, contending that it fails to allege the material misrepresentation and scienter elements of the section 10(b) claim. TranS1 then filed a bankruptcy petition in Delaware, which resulted in an automatic stay of the class action proceedings with respect to TranS1.
During the bankruptcy stay, this litigation could only proceed in the district court with respect to the Officers. On May 14, 2015, the court dismissed the Complaint as to the Officers. See Order, Singer v. TranS1, Inc. , No. 7:12-cv-00023 (E.D.N.C. May 14, 2015), ECF No. 72 (the "Officers Order"). With respect to the material misrepresentation element, that Order explained that the Complaint is inadequate to show that any of the Officers "knew TranS1's reimbursement practices were illegal" or "failed to sufficiently disclose TranS1's reimbursement practices." Id. at 13-14. On the scienter element, the Officers Order specified that the Complaint "does not allege when and how the [Officers] knew or recklessly failed to know that their disclosures and statements were false or misleading, much less make a powerful or cogent inference of [the Officers'] scienter." Id. at 20 (internal quotation marks omitted). The Officers Order further observed that, despite being given "three opportunities to submit a complaint *437 that meets the requirements set forth herein," Singer had "failed to do so." Id. at 23. The Officers Order thus dismissed the Complaint as to the Officers with prejudice.
4.
After lifting the bankruptcy stay on May 14, 2015, the district court requested supplemental briefing on whether the dismissal motion should also be granted as to TranS1. On December 18, 2015-after receiving further briefing-the court granted TranS1's motion to dismiss. See Order, Singer v. TranS1, Inc. , No. 7:12-cv-00023 (E.D.N.C. Dec. 8, 2015), ECF No. 92 (the "Final Order").
The Final Order first explained that, because the Complaint had been dismissed as to the Officers, "the only way ... to establish liability as to [TranS1], the corporate defendant, is (1) to identify some other corporate agent who made a material misrepresentation or omission, and (2) to make allegations manifesting a strong inference of scienter as to at least one authorized agent." See Final Order 5. The court then concluded, on the material misrepresentation element of the section 10(b) claim, that the Complaint "does not sufficiently allege that any authorized corporate agent made a material misrepresentation or omission." Id. at 6. With respect to the scienter element, the Final Order reiterated that, as with the Officers, the Complaint fails to allege that TranS1 "knew that its public disclosures and statements were misleading." Id. The Final Order thus dismissed the Complaint as to TranS1 with prejudice.
With the Complaint fully dismissed, Singer noted his appeal in No. 15-2579, challenging the district court's rulings that the Complaint does not allege the material misrepresentation and scienter elements of the section 10(b) claim. The Company thereafter cross-appealed in No. 16-1019, taking issue with the Reconsideration Order's earlier ruling that the loss causation element is sufficiently pleaded. We possess jurisdiction over these appeals pursuant to 28 U.S.C. § 1291.
II.
These appeals relate solely to the sufficiency of the Complaint, which we review de novo. See Teachers' Ret. Sys. of La. v. Hunter , 477 F.3d 162, 170 (4th Cir. 2007). In reviewing the district court's dismissal, we accept all factual allegations in the Complaint as true, and we consider the Complaint in its entirety. See Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc. , 576 F.3d 172, 176 (4th Cir. 2009). We also draw all reasonable inferences in favor of Singer. See Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc. , 591 F.3d 250, 253 (4th Cir. 2009). In addition to the Complaint, we are entitled to consider matters of which the district court took judicial notice, including the qui tam complaint and the qui tam settlement. See Katyle v. Penn Nat'l Gaming, Inc. , 637 F.3d 462, 466 (4th Cir. 2011) ; see also supra note 9.
III.
We first consider Singer's appeal (No. 15-2579), which implicates the Officers Order and the Final Order. If we were to affirm the district court's rulings in those Orders, the Company's cross-appeal would be moot, as it merely provides an alternative reason for dismissal of the Complaint.
The Complaint advances two separate claims. First, it alleges that TranS1 and the Officers violated section 10(b) of the Securities Exchange Act, as well as its companion regulatory provision in SEC Rule 10b-5. See 15 U.S.C. § 78j(b) ;
*438 17 C.F.R. § 240.10b-5.[11] Second, the Complaint alleges separate violations of section 20(a) against the Officers. See 15 U.S.C. § 78t(a).[12] Section 10(b) and SEC Rule 10b-5, along with section 20(a), "act to protect the integrity of the market in securities and prohibit fraud in connection with the purchase or sale of a security." See Cozzarelli v. Inspire Pharm. Inc. , 549 F.3d 618, 623 (4th Cir. 2008).
The Supreme Court has recognized that a typical claim under section 10(b) and SEC Rule 10b-5 has six elements. See Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc. , 552 U.S. 148, 157, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008). Those elements are the following: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Id. (citing Dura Pharm., Inc. v. Broudo , 544 U.S. 336, 341-42, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005) ). Relatedly, section 20(a) is the vehicle for imposing liability on control persons. The liability of a control person under section 20(a) is derivative of-and dependent upon-liability of a controlled person under section 10(b). See Yates v. Mun. Mortg. & Equity, LLC , 744 F.3d 874, 894 n.8 (4th Cir. 2014). Thus, if the complaint "is legally insufficient with respect to the [section] 10(b) claim, the [derivative section] 20(a) claim must also fail." Id.[13]
*439 Importantly, the allegations of securities fraud claims in the federal courts are subject to strict pleading standards. As a general proposition, "[i]n alleging fraud ..., a party must state with particularity the circumstances constituting fraud." See Fed. R. Civ. P. 9(b). Moreover, the Private Securities Litigation Reform Act of 1995 imposes additional pleading requirements to prevent Securities Exchange Act claims from being "employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law." See Tellabs, Inc. v. Makor Issues & Rights, Ltd. , 551 U.S. 308, 313, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). Pursuant thereto, a securities fraud complaint must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." See 15 U.S.C. § 78u-4(b)(1). Further, "the complaint shall ... state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Id. § 78u-4(b)(2)(A). If those exacting pleading requirements are not satisfied, the complaint must be dismissed. See Cozzarelli , 549 F.3d at 623.
In his appeal, Singer challenges the district court's rulings-in the Officers Order and the Final Order-that the Complaint fails to allege the material misrepresentation and scienter elements of the section 10(b) claim. As explained below, the Complaint sufficiently pleads those elements. Accordingly, we vacate the court's rulings with respect to the misrepresentation and scienter elements.
A.
To begin, the Company argues that the Complaint fails to allege the material misrepresentation element. That element of a section 10(b) claim requires an allegation that the defendant acted deceptively, i.e., that the defendant engaged in deceptive acts such as "misstatements" and "omissions by those with a duty to disclose." See U.S. S.E.C. v. Pirate Inv'r LLC , 580 F.3d 233, 239-40 (4th Cir. 2009). Furthermore, the deceptive act "must concern a material fact." Id. at 240.
1.
As set forth above, the Complaint specifies a series of statements alleged to have been misleading, because of both what was falsely said and what was deceptively omitted. By those statements-made by the Officers in SEC filings, press releases, and conference calls-the Company acknowledged the new Category III code for the System and efforts to eventually return to a Category I code. At the same time, however, the Company misrepresented the assistance and training it was providing to surgeons as being wholly for the attainment of " 'appropriate' "-i.e., legal-reimbursements for the System. See, e.g. , Compl. ¶¶ 69, 74. The Company also misrepresented that the Category III code was " 'not an experimental code.' " Id. ¶ 88. Meanwhile, the Company downplayed the immediate financial consequences of the Category III code, and suggested that losses would be insignificant and temporary. Throughout the Officers' statements, they omitted key facts: that the Company was coaching surgeons to improperly use a Category I code for the System, rather than the mandatory Category III code, and was relying on that fraudulent reimbursement scheme to generate a substantial portion of TranS1's continuing revenues.
*440 In light of those allegations, the Complaint sufficiently pleads the material misrepresentation element of the section 10(b) claim. That is, the Complaint's allegations of false and misleading statements and omissions easily survive a materiality analysis at the dismissal stage of the proceedings. See Pirate Inv'r , 580 F.3d at 240 (explaining that a "fact stated or omitted is material if there is a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact" (internal quotation marks omitted) ); see also Ganino v. Citizens Utils. Co. , 228 F.3d 154, 162 (2d Cir. 2000) (recognizing that "a complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance" (alteration and internal quotation marks omitted) ).
Furthermore, the Complaint adequately alleges that the Company acted deceptively by way of misstatements and omissions by those with a duty to disclose. The Complaint's focus is on the Company's repeated failure to divulge its fraudulent reimbursement scheme. Of course, as the Supreme Court has observed, section 10(b) and SEC Rule 10b-5 "do not create an affirmative duty to disclose any and all material information." See Matrixx Initiatives, Inc. v. Siracusano , 563 U.S. 27, 44, 131 S.Ct. 1309, 179 L.Ed.2d 398 (2011) ; see also Basic, Inc. v. Levinson , 485 U.S. 224, 239 n.17, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) ("Silence, absent a duty to disclose, is not misleading under [SEC] Rule 10b-5."). Nevertheless, disclosure of material information is required "when necessary to make statements made, in the light of the circumstances under which they were made, not misleading." See Matrixx Initiatives , 563 U.S. at 44, 131 S.Ct. 1309 (alteration and internal quotation marks omitted). In other words, "companies can control what they have to disclose under [section 10(b) and SEC Rule 10b-5] by controlling what they say to the market." Id.
Under the Complaint, by choosing to inform the market that it was training surgeons on how to obtain reimbursements for the System in the wake of the AMA's Category III coding requirement, the Company was obliged to further disclose its fraudulent reimbursement scheme, i.e., its instructions to surgeons to unlawfully code the System under Category I. Otherwise, the Officers' statements about the Company's training efforts were utterly misleading. The same is true of the Officers' statements that the Category III code was causing only limited losses; by not disclosing the Company's fraudulent reimbursement scheme and improper use of Category I codes, the Officers misled the market about the actual source of TranS1's continuing revenues. As such, the Complaint alleges that the Company possessed-and breached-a duty to disclose the fraudulent reimbursement scheme. See, e.g. , Meyer v. Jinkosolar Holdings Co. , 761 F.3d 245, 250 (2d Cir. 2014) ("Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth."); see also Br. of Appellant 37 ("Having put coding and reimbursement front and center [on every analyst conference call and in every public filing during the class period], [the Company was] compelled to disclose the full extent of [its] reimbursement strategy....").
*441 2.
The Company nevertheless contends that the Complaint is fatally insufficient on the material misrepresentation element for several reasons. First, the Company argues that the Complaint reflects that the Company fully disclosed its reimbursement practices, rendering the Officers' statements not misleading. We reject that contention. To be sure, the Officers informed the market that the Company was assisting surgeons in obtaining reimbursements for the System by way of, e.g., its "hotline" and reimbursement guide. The Officers also acknowledged the AMA's designation of the System as a Category III procedure and provided some truthful information relevant thereto. Such information included that the Company was making efforts to reobtain a Category I code for the System. It also included that, in the meantime, surgeons using the Category III code might be denied payment for the System itself, but could at least be reimbursed for other aspects of a spinal surgery. Critically, however, the Officers did not disclose that the Company was coaching surgeons to improperly use a Category I code for the System, rather than the mandatory Category III code.
Next, the Company maintains that the Complaint does not properly allege violations of the federal False Claims Act or any other law, in that no court or other adjudicative body has found the Company's reimbursement practices to be illegal, and that the Complaint explains no theory of illegality. Unfortunately for the Company, the duty to disclose may extend to uncharged and unadjudicated illegal conduct. See, e.g. , Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC , 164 F.Supp.3d 568, 581 (S.D.N.Y. 2016) (observing that "a corporation may be compelled to disclose uncharged wrongdoing if its statements are or become materially misleading in the absence of disclosure"). Moreover, even if the Complaint insufficiently describes how the scheme contravenes the False Claims Act and other statutes, the judicially noticed qui tam complaint fully explains the scheme's alleged illegality. See J.A. 929-64 (enumerating, inter alia, provisions of False Claims Act and compliance rules governing Medicare payments, as well as Company's conduct violative thereof).
Relying on the Sixth Circuit's 2009 decision in Indiana State District Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc. , 583 F.3d 935 (6th Cir. 2009), the Company also contends that it had no duty to disclose its reimbursement practices because the Complaint does not allege that the Company specifically asserted it was complying with a particular law. In Omnicare , the plaintiffs were pursuing a section 10(b) claim on the theory that the defendant corporation "had a duty to disclose its involvement in 'illegal' activities," in that it had "made several general statements that it complied with state law and regulations and had a policy of complying with the law." See 583 F.3d at 945. The court of appeals rejected the plaintiffs' theory, because the complaint did "not sufficiently establish that [the corporation and its officers] actually knew that the 'legal compliance' statements were false when made," and because "the generic claim of lawfulness, in the absence of any specifics, [did not] require the disclosure of the allegedly 'illegal' activities." Id. at 947. Contrary to the Company's contention herein, the Omnicare decision did not hold that there is never a duty to disclose an illegal activity absent a specific assertion of compliance with the relevant law. Rather, the Omnicare court simply concluded that the generic assertions of legal compliance made in that case-without more-did not engender a duty to disclose the illegal activities alleged *442 by the plaintiffs. Here, the Complaint does not depend on mere generic assertions of legal compliance to establish the Company's duty to disclose its fraudulent reimbursement scheme. The Complaint relies instead on the Company's choice to speak about its reimbursement practices-including, but not limited to, its efforts to train surgeons to attain " 'appropriate' " reimbursements-without telling the whole, material truth. Accordingly, the Omnicare decision is inapposite to the material misrepresentation analysis in these proceedings.[14]
Finally, the Company argues that its failure to divulge the alleged fraudulent reimbursement scheme cannot have rendered any of the Officers' statements materially misleading, because the Form 10-Ks filed by TranS1 with the SEC included general warnings about the risks of regulatory scrutiny and litigation. For example, the 2008 Form 10-K cautioned the market that TranS1 "may be subject to or otherwise affected by federal and state healthcare laws, including fraud and abuse and health information privacy and security laws, and could face substantial penalties if we are unable to fully comply with such laws." See J.A. 128 (emphasis omitted). The Company's argument that such general warnings effectively satisfy the duty to disclose specific illegal activities was rejected by the Second Circuit in its 2014 Meyer decision. There, the defendant had warned the market that it "generates, uses, and stores dangerous chemicals and wastes and is subject to Chinese regulations regarding such chemicals and wastes," plus "that compliance with such regulations is costly and that non-compliance may lead to bad publicity, fines, and even a suspension of the business." See Meyer , 761 F.3d at 251 (internal quotation marks omitted). In concluding that those warnings failed to cure the corporation's non-disclosure of ongoing and serious pollution violations, the Meyer court explained:
A generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability. One cannot, for example, disclose in a securities offering a business's peculiar risk of fire, the installation of a comprehensive sprinkler system to reduce fire danger, and omit the fact that the system has been found to be inoperable, without misleading investors.
Id. (citation omitted). We agree with the Second Circuit's cogent analysis. Despite the general warnings in TranS1's Form 10-Ks, the Officers' statements about the Company's reimbursement practices may be deemed materially misleading premised on the omission of the fraudulent reimbursement scheme.
At bottom, the Complaint is sufficient to establish that, by choosing to speak about its reimbursement practices, the Company possessed a duty to disclose its alleged illegal conduct. The Company violated that *443 duty and acted deceptively by way of false statements and statements that were misleading because they omitted the fraudulent reimbursement scheme. Furthermore, the facts of that scheme were material, in that a reasonable investor would have considered the scheme important in deciding whether to buy or sell TranS1 stock, and would have viewed the total mix of information made available to be significantly altered by the scheme's disclosure. We are therefore satisfied that the Complaint adequately alleges the material misrepresentation element of the section 10(b) claim.
B.
Turning to the issue of scienter, the Company argues that the Complaint also insufficiently pleads that element of the section 10(b) claim. In order to allege the scienter element, a plaintiff must demonstrate "that the defendant acted with 'a mental state embracing intent to deceive, manipulate, or defraud.' " See Zak v. Chelsea Therapeutics Int'l, Ltd. , 780 F.3d 597, 606 (4th Cir. 2015) (quoting Tellabs , 551 U.S. at 319, 127 S.Ct. 2499 ). A complaint's "[a]llegations of reckless conduct can satisfy the level of scienter necessary to survive a motion to dismiss." Id. (citing Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc. , 576 F.3d 172, 181 (4th Cir. 2009) ). The reckless conduct sufficient to engender the mandatory strong inference of scienter may be conduct that, inter alia, "is 'so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.' " Id. (quoting Matrix Capital , 576 F.3d at 181 ).
According to the Complaint, TranS1 and its Officers responded to the new, financially threatening Category III code for the System with a mix of legal and illegal strategies. Their legal strategies included advising surgeons to "bury" the Category III code for the System among the CPT codes for other parts of a spinal surgery so that the Category III code might be overlooked; touting efforts to move the System from the Category III code back to a lucrative Category I code in the near future; and emphasizing that, even though the System itself might be presently non-reimbursable, surgeons could yet be compensated for a surgery's other aspects.
Meanwhile, as for the illegal strategies, the Company engaged in its fraudulent reimbursement scheme to encourage and coach surgeons to continue coding the System under Category I despite the mandatory Category III code. Significantly, the Complaint reflects that the illegality of the fraudulent reimbursement scheme was obvious and known to TranS1 and the Officers. That is, the law was clear that, once the System was assigned the Category III code, only the Category III code could be used for the System. See, e.g. , Complaint ¶ 29 (alleging that "[f]ederal law, including the False Claims Act, requires surgeons to label services rendered with an appropriate CPT code, to insure that reimbursement[s] from [health insurers and government-funded healthcare programs] are legitimately procured"); J.A. 941 (qui tam complaint) (explaining that, once the Category III code for the System took effect, the System could "only " be billed as a Category III procedure). That the Company knew the law is further evidenced by its public acknowledgment of the System's Category III code and related reimbursement issues. Indeed, if the Company believed that the System could still lawfully be coded under Category I, it certainly would have said so. It is striking that-throughout the Officers' statements in the relevant SEC
*444 filings, press releases, and conference calls-they spoke in detail about the Company's legal strategies to deal with the new Category III coding requirement, without ever mentioning the Company's illegal efforts to persuade surgeons to use a Category I code instead. Those recurring omissions are particularly remarkable because the undisclosed scheme was the primary source of TranS1's continuing revenues, while the strategies discussed in the Officers' various statements generated far less significant returns. See Zak , 780 F.3d at 611 (explaining that "the scienter inquiry necessarily involves consideration of the facts and of the nature of the alleged omissions or misleading statements within the context of the statements that a defendant affirmatively made").
The Company contends, however, that the Complaint is insufficient on the scienter element because it fails to allege facts demonstrating that the Officers knew of the fraudulent reimbursement scheme's existence, much less the scheme's illegality. Of course, the Complaint is premised on the proposition that the Officers directed the fraudulent reimbursement scheme, not that lower-level agents or employees independently conjured up and carried out the scheme without the Officers' knowledge. And, in any event, the fact that the System's new Category III code did not result in substantially greater losses to TranS1 would have put any otherwise-innocent Officer on notice that the fraudulent reimbursement scheme was afoot.
By alleging that the fraudulent reimbursement scheme was known to the Officers, clearly illegal, and fundamental to TranS1's financial success, the Complaint establishes that the Officers' failure to disclose the scheme presented a danger of misleading Singer and other investors-a danger that was also known to the Officers, or so obvious that the Officers must have been aware of it. That is, the Complaint gives rise to a strong inference that TranS1 and the Officers intended to deceive the market, or at the very least acted recklessly, when they made false and misleading statements about the Company's reimbursement practices that omitted the fraudulent reimbursement scheme. See Zak , 780 F.3d at 610 (concluding that there was a strong inference of scienter where "the plaintiffs' allegations, when considered in the context of the entire complaint, [demonstrated] that the defendants either knowingly or recklessly misled investors by failing to disclose critical information ..., while releasing less damaging information that they knew was incomplete"); cf. Pirate Inv'r , 580 F.3d at 243 (affirming scienter finding where defendant, acting on financial motive, made statement knowing it was false).
In these circumstances, we are satisfied that the Complaint adequately pleads the scienter element of the section 10(b) claim against both TranS1 and the Officers. Consequently, in Singer's appeal, we vacate the district court's rulings in the Officers Order and the Final Order that the Complaint fails to allege the scienter element, along with the court's rulings in those same Orders that the Complaint is insufficient as to the material misrepresentation element of the section 10(b) claim.
IV.
Because we rule in favor of Singer in his appeal, the Company's cross-appeal (No. 16-1019) must now be addressed. In that regard, we assess whether the Complaint sufficiently pleads the loss causation element of the section 10(b) claim, as the district court concluded in its Reconsideration Order.
We are obliged to review a complaint's "allegations of loss causation for sufficient specificity, a standard largely *445 consonant with Fed. R. Civ. P. 9(b)'s requirement that averments of fraud be pled with particularity." See Katyle v. Penn Nat'l Gaming, Inc. , 637 F.3d 462, 471 (4th Cir. 2011) (internal quotation marks omitted). The loss causation element requires the pleading of "a sufficiently direct relationship between the plaintiff's economic loss and the defendant's fraudulent conduct," which may be accomplished by alleging facts establishing that the defendant's "misrepresentation or omission was one substantial cause of the investment's decline in value." Id. at 472 (internal quotation marks omitted). In such circumstances, the plaintiff must plead (1) the "exposure" of the defendant's misrepresentation or omission, i.e., the revelation of "new facts suggesting [the defendant] perpetrated a fraud on the market," and (2) that such exposure "resulted in the decline of [the defendant's] share price." Id. at 473 (emphasis and internal quotation marks omitted).
On appeal, the Company challenges the district court's ruling that the Complaint alleges exposure of the Company's false and misleading statements and omissions under the materialization of a concealed risk theory. The Company maintains that the Complaint fails under that theory, as well as the related, but somewhat distinct, corrective disclosure theory. For his part, Singer contends that the Complaint sufficiently pleads exposure under each theory. We conclude that the Complaint demonstrates exposure by way of an amalgam of the two theories and, thus, affirm.
A.
As we have recognized, exposure for purposes of the loss causation element can be alleged pursuant to the corrective disclosure theory and the materialization of a concealed risk theory. On the one hand, under the corrective disclosure theory, a complaint may allege that the defendant company itself made a disclosure that "publicly revealed for the first time" that the company perpetrated a fraud on the market by way of a material misrepresentation or omission. See Katyle , 637 F.3d at 473. On the other hand, utilizing the materialization of a concealed risk theory, a complaint may allege that news from another source revealed the company's fraud. Id. at 477 n.10 (explaining that, "[i]n such a case, the plaintiffs would not need to identify a public disclosure that corrected the previous, misleading disclosure because the news of the materialized risk would itself be the revelation of ... fraud that caused plaintiffs' loss" (quoting Teachers' Ret. Sys. of La. v. Hunter , 477 F.3d 162, 187 n.3 (4th Cir. 2007) ) ). The materialization of a concealed risk theory has been generally accepted as a means of proving loss causation because, inter alia, a company "accused of securities fraud should not escape liability by simply avoiding a corrective disclosure." See Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp. , 830 F.3d 376, 384-85 (6th Cir. 2016).[15]
*446 Importantly, the ultimate loss causation inquiry under either the corrective disclosure theory or the materialization of a concealed risk theory is the same: whether a "misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." See In re Vivendi, S.A. Sec. Litig. , 838 F.3d 223, 261-62 (2d Cir. 2016) (emphasis omitted). That is, pursuant to each theory, the plaintiff must show "that the loss caused by the alleged fraud results from the 'relevant truth ... leak[ing] out.' " Id. at 261 (quoting Dura Pharm., Inc. v. Broudo , 544 U.S. 336, 342, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005) ).
As we have recognized in the context of corrective disclosures, "neither a single complete disclosure nor a fact-for-fact disclosure of the relevant truth to the market is a necessary prerequisite to establishing loss causation (although either may be sufficient)." See Katyle , 637 F.3d at 472. Rather, the truth may have "gradually emerged through a series of partial disclosures," with the "entire series of partial disclosures [prompting] the stock price deflation." Id. Moreover, the disclosure or series of partial disclosures "need not precisely identify the misrepresentation or omission" about which the plaintiff complains, but "must reveal to the market in some sense the fraudulent nature of" such misrepresentation or omission, and "must at least relate back to the misrepresentation [or omission] and not to some other negative information about the company." Id. at 473 (emphasis and internal quotation marks omitted).
B.
Here, to establish exposure for purposes of the loss causation element, the Complaint relies on a partial corrective disclosure by the Company (TranS1's Form 8-K of October 17, 2011, reporting that it had received a subpoena from the DHHS), coupled with news from another source (the October 18, 2011 analyst report addressing the subpoena). At the time, the market already knew from the Officers' public statements that, as of January 1, 2009, the System was required to be coded under Category III and thus was largely non-reimbursable. The market also knew of TranS1's lawful efforts to return the System to a lucrative Category I code and to deal with the Category III code in the meantime. Together, the Form 8-K and analyst report revealed to the market the following additional facts: that TranS1 had received a subpoena on or about October 6, 2011, issued by the DHHS " 'under the authority of the federal healthcare fraud and false claims statutes' "; that the items sought by the subpoena included " 'reimbursement communications with physicians' "; and that, despite the System's nearly three-year-old Category III coding requirement and the Company's purported *447 " 'strong efforts to educate physicians about correct coding,' " approximately " 'half of TranS1's revenues [were coming] from physicians still using [a Category I] code.' " See Compl. ¶¶ 108-109.
As such, TranS1's own Form 8-K and the analyst report revealed enough facts for the market to finally recognize what the Officers' previous statements had materially omitted: the existence of the Company's fraudulent reimbursement scheme to encourage surgeons' continued use of a Category I code for the System, rather than the mandatory Category III code, and to thereby bolster TranS1's System-dependent revenues. Indeed, the plausibility of that interpretation of the facts revealed in the Form 8-K and the analyst report is evidenced by the analyst report's opinion that the subpoena " 'could be due to reimbursement communications.' " See Compl. ¶ 109. As the Complaint understandably emphasizes, based on the new facts, the analyst report "surmised with radar precision that the subpoena ... relat[ed] to [TranS1's] illicit 'reimbursement communications.' " Id. ¶ 9. In these circumstances, pursuant to an amalgam of the corrective disclosure and materialization of the concealed risk theories, the facts revealed in the Form 8-K and the analyst report were sufficient to establish exposure for purposes of the loss causation element, because those facts collectively "suggest[ ] [the Company] perpetrated a fraud on the market." See Katyle , 637 F.3d at 473.
Finally, to the extent the Company argues that the Complaint fails to allege that the exposure of the Company's concealment of its fraudulent reimbursement scheme resulted in the decline of TranS1's stock price, we disagree. According to the Complaint, the revelations in the October 17, 2011 Form 8-K and the October 18, 2011 analyst report caused the value of TranS1's stock to plummet more than 40% on October 18, 2011, alone. Such an allegation is wholly adequate to demonstrate that the exposure of the Company's fraud was at least "one substantial cause of the investment's decline in value." See Katyle , 637 F.3d at 472 (internal quotation marks omitted).
Having conducted a thorough and holistic assessment of the Complaint, we conclude that its allegations are sufficient to plead the loss causation element of the section 10(b) claim, as the district court properly determined. That is, the Complaint satisfies the ultimate loss causation inquiry by alleging losses resulting from "the relevant truth ... leak[ing] out" about the Company's previously concealed fraudulent reimbursement scheme. See Dura Pharm. , 544 U.S. at 342, 125 S.Ct. 1627. We therefore affirm the court's loss causation ruling in its Reconsideration Order and reject the Company's cross-appeal.[16]
V.
Pursuant to the foregoing, we vacate the judgment of the district court and remand in No. 15-2579 for such other and further proceedings as may be appropriate. We affirm the ruling being challenged in the cross-appeal, that is, No. 16-1019.
No. 15-2579 VACATED AND REMANDED, and No. 16-1019 AFFIRMED

Because we are assessing the dismissal of the Complaint, we accept as true all well-pleaded facts in the Complaint and construe them in the light most favorable to lead plaintiff Singer. See SD3, LLC v. Black & Decker (U.S.) Inc. , 801 F.3d 412, 422 (4th Cir. 2015). In so doing, we draw all reasonable inferences in favor of Singer. See Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc. , 591 F.3d 250, 253 (4th Cir. 2009). We are also entitled to consider matters of which the district court took judicial notice. See Katyle v. Penn Nat'l Gaming, Inc. , 637 F.3d 462, 466 (4th Cir. 2011). Facts drawn from the Complaint and from judicially noticed documents are thus recited in the light most favorable to Singer.

As described in the Complaint, Reali was TranS1's CEO (since January 2011), president (since January 2010), and COO (January 2010 to January 2011), and also on its board of directors (since January 2011); Slattery was TranS1's CFO (since April 2010) and on its board of directors (November 2007 to April 2010); Randall was TranS1's CEO (June 2002 to January 2011), its president (June 2002 to January 2010), and on its board of directors (since June 2002), and also was the executive chairman since leaving his post as CEO; and Luetkemeyer was TranS1's CFO (April 2007 to March 2010). See Compl. ¶¶ 20-23.

According to the Complaint, the System does not constitute a Category I anterior fusion procedure because, inter alia, System surgeries are "performed straight up the tailbone and never approach[ ] the anterior portion of the spine." See Compl. ¶ 33.

Pursuant to federal securities statutes and regulations, publicly traded companies are required to annually file a Form 10-K with the SEC. See 15 U.S.C. §§ 78m, 78o(d) ; 17 C.F.R. § 249.310.

Like a Form 10-K, a Form 10-Q is filed with the SEC under the federal securities statutes and regulations. See 15 U.S.C. §§ 78m, 78o(d) ; 17 C.F.R. § 249.308a.

A Form 8-K-like a Form 10-K or a Form 10-Q-is a report filed under law with the SEC, which announces major events of concern to shareholders. See 15 U.S.C. §§ 78m, 78o(d) ; 17 C.F.R. § 249.308.

The False Claims Act is codified at 31 U.S.C. §§ 3729 -3733. It imposes liability on individuals and entities that have defrauded federal government programs. An individual (i.e., a relator) can initiate a claim under the Act by way of a qui tam action. See 31 U.S.C. § 3730(b). The United States is entitled to intervene and control any such qui tam action. If the action is successful, by settlement or otherwise, the relator or relators may share in the award. Id. § 3730(d).

Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in these appeals.

In addition to being the subject of substantial discussion in the Complaint, the qui tam complaint and the qui tam settlement were judicially noticed by the district court in September 2013. See Order, Caplin v. TranS1, Inc. , No. 7:12-cv-00023 (E.D.N.C. Sept. 19, 2013), ECF No. 48.

Caplin is yet a named plaintiff in the class action, but he is not a party to these appeals.

Section 10(b) of the Securities Exchange Act, which is codified at § 78j(b) of Title 15 of the United States Code, provides in pertinent part:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange-
* * *
(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange[,] ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
See 15 U.S.C. § 78j. SEC Rule 10b-5 is found in section 240.10b-5 of Title 17 of the Code of Federal Regulations, and provides in pertinent part:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
* * *
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading ...
* * *
in connection with the purchase or sale of any security.
See 17 C.F.R. § 240.10b-5.

Section 20(a) of the Securities Exchange Act, which is codified at § 78t(a) of Title 15 of the United States Code, provides in pertinent part:
Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable ..., unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.
See 15 U.S.C. § 78t(a).

The district court dismissed the section 20(a) claim against the Officers solely because the Complaint does not sufficiently plead the section 10(b) claim. Nevertheless, as an alternative ground for affirmance of the court's dismissal of the section 20(a) claim, the Company maintains that the Complaint merely and inadequately "alleges that by virtue of the [Officers'] corporate positions they had control." See Br. of Appellees 66. Because the court did not address that contention, we do not address it, though it may be considered on remand. See United States ex rel. Carson v. Manor Care, Inc. , 851 F.3d 293, 307 n.7 (4th Cir. 2017).

Notably, the district court incorrectly deemed this case to be "analogous" to Omnicare and thus ruled the Complaint to be insufficient on the material misrepresentation element for failing to allege that the Company "knew TranS1's reimbursement practices were illegal" and "made express representations to the contrary." See Officers Order 15-16 (citing Omnicare , 583 F.3d at 945-47 ). Because the 2009 Omnicare decision is inapposite here, we need not decide whether we agree with it. Were we to do so, however, we would also consider decisions in subsequent Omnicare proceedings that were not discussed by the district court or the Company. See Ind. State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc. , 719 F.3d 498 (6th Cir. 2013), vacated and remanded , Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund , --- U.S. ----, 135 S.Ct. 1318, 191 L.Ed.2d 253 (2015).

Although we recognized in our Katyle and Teachers' Retirement System decisions that exposure for purposes of the loss causation element can be proved by way of the materialization of a concealed risk theory, we have not heretofore had occasion to apply that theory. Meanwhile, a decisive majority of our fellow courts of appeals have applied the materialization of a concealed risk theory or, like we have, recognized it as a viable means for a securities fraud plaintiff to prove exposure. See In re Omnicom Grp., Inc. Sec. Litig. , 597 F.3d 501, 513 (2d Cir. 2010) (applying materialization of concealed risk theory); Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp. , 830 F.3d 376, 384-85 (6th Cir. 2016) (same); Schaaf v. Residential Funding Corp. , 517 F.3d 544, 550-553 (8th Cir. 2008) (same); Nakkhumpun v. Taylor , 782 F.3d 1142, 1156 (10th Cir. 2015) (same); see also McCabe v. Ernst & Young, LLP , 494 F.3d 418, 428-29 (3d Cir. 2007) (recognizing materialization of concealed risk theory); Ray v. Citigroup Glob. Mkts., Inc. , 482 F.3d 991, 995 (7th Cir. 2007) (same); Nuveen Mun. High Income Opportunity Fund v. City of Alameda , 730 F.3d 1111, 1120 (9th Cir. 2013) (same); In re Harman Int'l Indus., Inc. Sec. Litig. , 791 F.3d 90, 110 (D.C. Cir. 2015) (same). Two courts of appeals have ruled that there should be an alternative to the corrective disclosure theory, albeit without adopting the "materialization of a concealed risk theory" by name, and another has simply refrained from unnecessarily deciding the validity of the materialization of a concealed risk theory. See Mass. Ret. Sys. v. CVS Caremark Corp. , 716 F.3d 229, 240 (1st Cir. 2013) (recognizing importance of alternative theory to prove loss causation absent company's corrective disclosure); Lormand v. US Unwired, Inc. , 565 F.3d 228, 264 & n.32 (5th Cir. 2009) (same); Hubbard v. BankAtlantic Bancorp, Inc. , 688 F.3d 713, 726 n.25 (11th Cir. 2012) (deeming it unnecessary to decide whether material of concealed risk theory may be used to prove loss causation).

Because we conclude that the Complaint sufficiently pleads the material misrepresentation, scienter, and loss causation elements of the section 10(b) claim, we need not address the contention made in Singer's appeal that the district court erred in denying leave to amend when it dismissed the Complaint.