**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 22-1815

GABRIELLE BARBOUR,

Plaintiff – Appellant,

v.

MERRICK B. GARLAND, United States Attorney General,

Defendant – Appellee.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  T. S. Ellis III, Senior District Judge.  (1:21-cv-00883-TSE-JFA)

ARGUED:  October 24, 2023                          Decided:  June 24, 2024

Before KING, WYNN, and RUSHING, Circuit Judges.

Reversed and remanded by published opinion.  Judge King wrote the majority opinion, in which Judge Wynn joined.  Judge Rushing wrote a dissenting opinion.

**ARGUED:**  Carolin Elisabeth Guentert, SANFORD HEISLER SHARP, LLP, New York, New York, for Appellant.  Meghan Elizabeth Loftus, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.  **ON BRIEF:**  David Tracey, SANFORD HEISLER SHARP, LLP, New York, New York, for Appellant.  Jessica D. Aber, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee.

KING, Circuit Judge:

Gabrielle Barbour, the plaintiff in this civil action on appeal from the Eastern District of Virginia, alleges that she was denied employment as a Special Agent with the Drug Enforcement Administration (the "DEA") in retaliation for her participation in a class action lawsuit against the Federal Bureau of Investigation (the "FBI") for workplace discrimination in violation of Title VII of the Civil Rights Act of 1964. Here, the operative Amended Complaint asserts a single Title VII retaliation claim and names as the defendant Merrick B. Garland in his official capacity as Attorney General and overseer of the DEA. *See Barbour v. Garland*, No. 1:21-cv-00883 (E.D. Va. Sept. 10, 2021), ECF No. 25 (the "Complaint"). On the motion of the defendant (whom we call the "DEA"), the district court dismissed the Complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. *See Barbour v. Garland*, No. 1:21-cv-00883 (E.D. Va. June 29, 2022), ECF No. 37 (the "Dismissal Order"). As explained herein, however, we reverse and remand for further proceedings.

I.

A.

We begin by reciting the facts alleged in the Complaint, which we must accept as true and view in the light most favorable to Barbour. *See Feminist Majority Found. v. Hurley*, 911 F.3d 674, 680 (4th Cir. 2018) ("Because the district court dismissed the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, we accept and recite the alleged facts in the light most favorable to the plaintiffs."). We also discuss

2

the theory of Barbour's retaliation claim, bearing in mind that — unlike the Complaint's factual allegations — we need not accept the correctness of its legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

1.

The Complaint reflects that, prior to her application for employment with the DEA as a Special Agent, Barbour had studied International Politics and Print Journalism at Pennsylvania State University, where she was also a student-athlete. *See* Complaint ¶ 10. After earning her bachelor's degree in 2014, Barbour completed a master's degree in Middle East Studies from George Washington University in 2016. *Id.* She subsequently worked as a Consultant for Grant Thornton LLP and as a Risk Governance Associate for J.P. Morgan. *Id.* Long before that, when she was 19 years old, Barbour had been employed in a six-week part-time summer job selling pots and pans for an outfit called Kitchen Kaboodle. *Id.* ¶ 32(b).

In 2018, Barbour began training at the FBI Academy in Quantico, Virginia, for a position as an Analyst with the FBI. *See* Complaint ¶ 11. In addition to obtaining a Top Secret/Sensitive Compartmented Information ("TS/SCI") security clearance, Barbour passed all of the academic tests and satisfied all of the job-related requirements for the FBI position. *Id.* ¶¶ 11, 14.

During the FBI training, Barbour received three "suitability notations," i.e., warnings for minor infractions. *See* Complaint ¶ 12. Those suitability notations were for parking in the wrong section of the parking lot, improperly responding to an email from a

3

guest speaker by expressing interest in being assigned to that speaker's squad, and "'breaking chain-of-command'" when sending emails requesting leave. *Id.* ¶ 12(a).

According to the Complaint, Barbour was also subject to pervasive sexual harassment and gender discrimination throughout her time at the FBI Academy. *See* Complaint ¶ 12(a)-(f). For example, while inquiring into her suitability notations, Barbour was told by a superior that she was a "'distraction'" to other trainees — a comment that Barbour understood to be a reference to unwanted sexual attention that she had received. *Id.* ¶ 12(a). Meanwhile, numerous male trainees pressured Barbour to have sex with them, sent her abusive text messages, and even followed her to her room; instructors and counselors would regularly tell Barbour (but not her male counterparts) "to smile more"; one male instructor discussed Barbour's personal life, "in a sexual and derogatory manner," with male trainees; and, when Barbour reported harassment to a female counselor, the counselor responded "'you own a mirror, you know you're a pretty girl,' that was the way things were, and to just 'play the game' if she wanted to succeed." *Id.* ¶ 12(b), (d)-(f).

On July 31, 2018, Barbour was required to appear before the Trainee Review Board due to her suitability notations. *See* Complaint ¶ 12(g). During that appearance, Barbour asked the Board to speak to two instructors who were not present and who Barbour believed would support her. *Id.* The Board told Barbour that they would speak to those instructors, but instead consulted another instructor whom Barbour had accused of sexual harassment. *Id.* That same day, the Assistant Director of the Training Division discharged Barbour from the FBI training for being "'unsuitable'" for FBI employment, citing the three suitability notations. *Id.*

4

2.

On August 1, 2018, the day after her discharge from the FBI training, Barbour received an email from the DEA inviting her to attend an orientation in New York for prospective job applicants. *See* Complaint ¶ 13. Barbour attended the orientation on August 13, 2018, and filled out initial application paperwork in which she disclosed the FBI discharge. *Id.* ¶ 14. She also inquired how long the application process would take for someone (like her) with an active TS/SCI security clearance. *Id.* In response, the DEA Special Agent leading the orientation informed Barbour that if she "passe[d] everything the first time," the application process could be completed and training started by "'May 2019, if not earlier.'" *Id.* The DEA training — like Barbour's prior FBI training — was to be conducted at the FBI Academy in Quantico, Virginia. *Id.* ¶ 1.

On October 12, 2018, Barbour received an email inviting her to officially apply for a DEA Special Agent position and partake in the Special Agent Mobile Application Center (the "SAMAC") in order to expedite the process. *See* Complaint ¶ 15. In mid-November 2018, Barbour took the three exams required to proceed with the application and passed each one on the first try. *Id.* ¶ 16. She achieved the highest score on the fitness test, among both men and women, and was informed that her performance would grant her application "priority processing." *Id.* In mid-December 2018, Barbour took and passed a drug test, as well as psychological and physical screenings. *Id.* ¶ 18. Three months later, on March 15, 2019, Barbour took a follow-up fitness test that was required within 60 days of the start of training. *Id.* ¶ 19. She scored the highest on that fitness test, once again among both men and women, keeping her on track to begin training in May 2019. *Id.*

3.

On April 15, 2019, Barbour filled out a Standard Form 86, or "SF-86," which is a required questionnaire for national security positions. *See* Complaint ¶ 20. In her SF-86, Barbour disclosed to the DEA that she was participating in a not-yet-filed class action lawsuit against the FBI for sexual harassment and gender discrimination. *Id.*

Following the submission of her SF-86, Barbour took polygraph examinations in late April and early May 2019, ultimately receiving favorable results. *See* Complaint ¶ 21. In the course of those examinations, Barbour twice disclosed to the polygraph examiner that her only illicit drug use involved ingesting a single Adderall pill when she was 15 years old. *Id.* ¶ 32(c).

On May 23, 2019, the class action lawsuit against the FBI was filed in the federal district court for the District of Columbia. *See* Complaint ¶ 20; *see also id.* ¶ 1 n.1 (identifying litigation as *Bird v. Barr*, No. 1:19-cv-01581 (D.D.C.)). The class action complaint was publicly available and widely publicized, but Barbour's role in the lawsuit was unclear from the papers because she was proceeding under a pseudonym pursuant to a ruling of the D.C. court. *Id*. ¶ 22; *see also id.* ¶ 12 (disclosing pseudonym used by Barbour in *Bird* litigation).

Thereafter, in mid-June 2019, Barbour had her background interview as part of the DEA's application process. *See* Complaint ¶ 22. The background investigator conducting the interview "obsessively questioned" Barbour about the class action lawsuit and asked her for personal details of the sexual harassment she experienced at the FBI Academy. *Id.*

6

According to the Complaint, this is when the DEA — by way of the background investigator — ascertained the particulars of Barbour's allegations against the FBI. *Id.*

On August 30, 2019, Barbour was informed by the DEA that her background check was complete and that her application was proceeding to the hiring panel. *See* Complaint ¶ 24. The background investigator then briefed the hiring panel on Barbour's participation in the class action lawsuit against the FBI. *Id.* ¶ 37. Meanwhile, an amended class action complaint was filed in the D.C. court, further illuminating Barbour's and the other plaintiffs' allegations against the FBI of sexual harassment and gender discrimination, including discriminatory discharge. *See Bird v. Barr*, No. 1:19-cv-01581 (D.D.C. Sept. 12, 2019), ECF No. 22.[1]

4.

Contrary to its prior assurances that her application was ready for the hiring panel's decision, the DEA told Barbour on October 1, 2019, "that her entire background check [was] to be redone." *See* Complaint ¶ 25. At that point, Barbour "began to receive varying information . . . about the status of her application." *Id.* Indeed, up to December 2019, she "received at least a dozen bits of conflicting . . . information regarding the status of her application, sometimes told that the background [check was] complete, other times told . . . it [was] not complete, sometimes . . . told she [was] at the hiring panel, and other times told

---

[1] In reviewing the Rule 12(b)(6) dismissal of the Complaint in these proceedings, we may properly take judicial notice of the filings in the *Bird* litigation, as those filings are matters of public record. *See Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

they [were] not allowed to tell her the status of the application." *Id.* ¶ 29. Moreover, DEA human resources contacts "ceased to respond to any of [Barbour's] emails despite being previously very responsive and helpful." *Id.*

During that same period, the DEA was also giving Barbour varying information about the decision to redo her background check. *See* Complaint ¶ 25. For example, on October 2, 2019 — the day after she was told the background check was to be redone — Barbour met with a new background investigator who said that "'the reason why we are here again'" was because Barbour had not identified an acquaintance as a foreign contact. *Id.* ¶ 26. In fact, however, that acquaintance was a U.S. citizen. *Id.*

Yet another background investigator contacted Barbour on October 30, 2019. *See* Complaint ¶ 27. This time, the background investigator requested to meet with Barbour's sister simply to verify a brief period of unemployment on Barbour's application — a period during which Barbour was unemployed because, as was already known by the DEA, she was enrolled in graduate school. *Id.* When Barbour's sister then met with the background investigator, the investigator's questions focused almost exclusively on Barbour's lawsuit against the FBI and "personal sexual details" related thereto. *Id.*

On December 23, 2019, Barbour called the Special Agent applicant phone line and was told that her application had been closed and that the DEA was no longer considering her for employment. *See* Complaint ¶ 30. Barbour asked when the DEA "came to this conclusion" and was told that it was nearly two weeks earlier, on December 10, 2019. *Id.* She next asked why she had not been informed of the DEA's decision but was given no answer. *Id.*

8

Finally, on January 6, 2020, Barbour received an email from William F. Kimbell, Chief of the DEA's Special Agent Recruitment section, providing reasons for Barbour's "non-selection" as a Special Agent (the "Kimbell email"). *See* Complaint ¶ 31. Specifically, the Kimbell email provided the following bullet-point list:

- You were removed from the FBI Training Academy for insubordination and failure to follow rules.

- You were removed from your position at Grant Thornton LLP for not meeting expectations of performance; the reason for removal was not reported on your SF-86.

- You were involuntarily terminated from your position at Kitchen Kaboodle for being unable to take direction; this employment and the reason for termination were not reported on your SF-86.

- You reported to the FBI that you ingested Adderall without a prescription in High School; you did not report this on your DEA Drug Use Statement — Question 5.

*See* J.A. 39.[2]  The Kimbell email then explained that "[a] Hiring Review Panel comprised of Senior Special Agents reviewed this information and as a result of the issues noted above, your conditional offer has been withdrawn." *Id.*  Additionally, the Kimbell email specified that the DEA's action was "a non-selection for the position for which you applied." *Id.*

---

[2] Although the Kimbell email is in the record as an attachment to the DEA's memorandum in support of its motion to dismiss — and not as an attachment to the Complaint — the Kimbell email may be considered in the Rule 12(b)(6) analysis because it is integral to and explicitly relied upon in the Complaint and its authenticity has not been challenged. *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011) (citing *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999)); *see also* J.A. 21-39.  (Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.)

9

5.

According to the Complaint, the non-selection actually occurred in retaliation for Barbour's claims against the FBI "for sexual harassment and discrimination while she was at the FBI's training Academy in Quantico, Virginia, the same place where Defendant DEA conducts its training." *See* Complaint ¶ 1. The Complaint further asserts that the DEA decided not to hire Barbour "when it found out the details of her allegations against the FBI," including "that [the FBI] discharged her because of her sex." *Id.* ¶ 2. In other words, the DEA's decision not to hire Barbour was "because of the litigation [against the FBI]." *Id.* ¶ 3.

a.

The Complaint acknowledges the reasons for Barbour's non-selection outlined in the Kimbell email, but insists that those are not the true reasons that the DEA denied Barbour employment as a Special Agent. In so doing, the Complaint explains why the reasons given by the DEA are unworthy of belief and can be seen as a pretext for unlawful retaliation.

(1)

As for the DEA's "number one reason" for Barbour's non-selection — her prior discharge from the FBI training, *see* Complaint ¶ 31 — the Complaint points to circumstances suggesting that it was not the FBI discharge itself, but rather Barbour's lawsuit challenging the discharge, that troubled the DEA. First of all, the Complaint specifies that Barbour had informed the DEA of the FBI discharge in her initial DEA application paperwork of August 2018. *Id.* ¶ 14. Notwithstanding Barbour's early

10

disclosure of the FBI discharge, the DEA thereafter invited Barbour in October 2018 to officially apply for a Special Agent position and partake in the expedited SAMAC process; allowed her to go through a series of entrance exams, fitness and drug tests, and psychological and physical screenings between November 2018 and March 2019; and allocated additional resources to polygraph examinations and an in-depth background check from April to late August 2019, when Barbour was informed that her application was proceeding to the DEA hiring panel.  *Id.* ¶¶ 15-16, 18-22, 24.

Next, the Complaint underscores that the FBI discharge did not become an impediment to Barbour's prospective employment as a DEA Special Agent until the DEA learned that Barbour was participating in the class action lawsuit against the FBI. According to the Complaint, in June 2019, following Barbour's disclosure of the FBI lawsuit, the original DEA background investigator "obsessively questioned" Barbour about the lawsuit and personal details of the sexual harassment she experienced at the FBI Academy.  *See* Complaint ¶ 22.  Once Barbour's application then reached the DEA hiring panel, the background investigator briefed the hiring panel on Barbour's claims against the FBI.  *Id.* ¶ 37.[3]  Soon thereafter, Barbour was informed in early October 2019 that her entire background check was to be redone, she received varying information about the

---

[3] We understand the Complaint to allege that sometime in August or September 2019, after receiving Barbour's application, the DEA hiring panel learned of Barbour's FBI lawsuit via briefing by the original background investigator.  *See* Complaint ¶¶ 24-25, 37.  The Complaint also asserts, "upon information and belief," that the DEA hiring panel received a background investigator briefing regarding lawsuit-related "sexually explicit facts" on the day of the non-selection decision, December 10, 2019.  *Id.* ¶ 23.

status of her application, she also was given dubious explanations for the need to redo the background check, a new background investigator's interview of Barbour's sister focused on the FBI lawsuit, and previously helpful DEA contacts ceased communicating with Barbour. *Id.* ¶¶ 25-27, 29.  The DEA hiring panel ultimately resolved in December 2019 to deny Barbour employment, without informing her of her non-selection or promptly providing the purported reasons for it.  *Id.* ¶¶ 30-31.  The Complaint asserts that "the temporal proximity between the revelation of the details of [Barbour's] experiences in the FBI and [the DEA hiring panel's non-selection] decision" constitutes significant evidence that the decision was retaliatory.  *Id.* ¶ 45.

The Complaint also highlights that, at the point that the DEA hiring panel allegedly based Barbour's non-selection on her prior discharge from the FBI training, the DEA hiring panel knew that the reason for Barbour's FBI discharge was hotly disputed.  *See* Complaint ¶ 37.  That is, although the FBI claimed that it discharged Barbour because of the three suitability notations, Barbour alleged in the class action lawsuit that the discharge was actually discriminatory.  *Id.*  Thereafter, the DEA hiring panel purported to adopt the FBI's position that Barbour was unfit for employment without investigating or even considering whether Barbour's allegations against the FBI of sexual harassment and gender discrimination were well-founded.  *Id.*; *see also id.* ¶ 39 (asserting that the FBI discharge was obviously "controversial at the very least").

(2)

Turning to the other reasons given by the DEA for Barbour's non-selection, the Complaint alleges that each of those reasons was "either provably wrong or irrelevant."

12

*See* Complaint ¶ 31. According to the Complaint, the second reason — that Barbour was terminated from her position at Grant Thornton LLP (and failed to report that termination on her SF-86) — was "completely false." *Id.* ¶ 32(a). Rather than being terminated from Grant Thornton, Barbour "voluntarily left after she moved from Washington, D.C. to New York upon getting married and buying a house in New York." *Id.* Moreover, as documented by emails and other paperwork, Grant Thornton did not tell the DEA background investigator that Barbour was terminated. *Id.*

The third reason given by the DEA for Barbour's non-selection — that she had previously been fired from her job with Kitchen Kaboodle (and failed to report either that job or the firing on her SF-86) — was, in the words of the Complaint, "simply frivolous" and "not credible." *See* Complaint ¶ 32(b). Although the Complaint alleges that Barbour's former supervisor at Kitchen Kaboodle denied telling the DEA that Barbour was fired, the Complaint seems to acknowledge that the firing in fact occurred, in that it alludes to a 19-year-old Barbour being fired "because she did not know the types and brands of pots and pans." *Id.* In any event, the Complaint asserts both that the job was too long ago to fall within the scope of the background investigation and that whether she was fired from a temporary summer job as a teenager or lacked "knowledge of the details of pots and pans" could not be deemed relevant to her qualifications to be a DEA Special Agent. *Id.*

As for the fourth reason given by the DEA for Barbour's non-selection — the suggestion that Barbour reported her ingestion of Adderall to the FBI, but not to the DEA — the Complaint characterizes it as "the most disconcerting lie." *See* Complaint ¶ 32(c). Although the Complaint does not dispute the Kimbell email's assertion that Barbour did

13

not report the Adderall ingestion on her "DEA Drug Use Statement — Question 5," *see* J.A. 39, the Complaint explains that Barbour otherwise reported the Adderall ingestion to the DEA. Specifically, the Complaint alleges that Barbour "disclosed, more than once, both on paper and in interviews, that the only drug use she ever had was one time when she was 15 years old and took an Adderall pill." *See* Complaint ¶ 32(c). That included twice disclosing the Adderall ingestion to the DEA polygraph examiner, "who submitted the paperwork with that information onto the hiring panel." *Id.* Furthermore, because the Adderall ingestion occurred prior to Barbour's 18th birthday and more than 10 years earlier, that drug use was outside the scope of the background investigation. *Id.*

In these circumstances, the Complaint asserts, "the only possible remaining conclusion is that [the DEA] retaliated against [Barbour] because she was suing a sister Justice Department Agency and . . . did not want someone who had filed a Title VII suit [against the FBI] joining the DEA." *See* Complaint ¶ 39. The Complaint elaborates that "a *prima facie* case" of retaliation is established not only by "the temporal proximity between the revelation of the details of [Barbour's] experiences in the FBI and the [DEA hiring panel's non-selection] decision," but also by "the pretextual nature of the remaining justifications for the action and the inconsistencies in the application process." *Id.* ¶ 45.

b.

The Complaint also emphasizes that the reasons given by the DEA hiring panel for Barbour's non-selection paled in comparison to the hiring panel's justifications for denying employment to four male applicants around the same time. *See* Complaint ¶ 40. As detailed in the Complaint, one of those men had admitted to recently paying five women

14

for sex; another had been discharged from the Army National Guard for willful and continuous absences; yet another had a documented history of tax evasion and delinquent child support payments; and the last reported hiring prostitutes approximately 45 times during his service in the United States Navy, plus had polygraph results indicating deception about illicit drug use. *Id.* The Complaint identifies the patently egregious conduct of those applicants and the "far more obvious reasons" for denying them employment as another "inconsistenc[y] in the application process" proving that Barbour's non-selection was retaliatory. *Id.* ¶¶ 40, 45.

c.

Finally, the Complaint discusses evidence that had been produced by the DEA in pre-litigation administrative proceedings, as well as evidence that Barbour sought but the DEA refused to share. *See* Complaint ¶ 6 (explaining that Barbour "exhausted her administrative remedies prior to bringing this suit" by filing "timely charges of discrimination with the DEA"). The evidence produced by the DEA included statements of Special Agent Recruitment Section Chief William Kimbell acknowledging that, when he participated in the DEA hiring panel's non-selection decision, he knew both that Barbour had filed a sexual harassment lawsuit against the FBI and that she had disclosed her prior Adderall ingestion to the DEA polygraph examiner. *Id.* ¶¶ 34-35, 38. The evidence produced by the DEA also included records concerning the four male applicants who were denied employment around the same time that Barbour was, but for comparatively graver misconduct. *Id.* ¶ 40.

15

As for evidence that Barbour sought but the DEA refused to share, the Complaint specifies that the DEA withheld records regarding successful Special Agent applicants, thereby impeding Barbour from comparing her record to theirs. *See* Complaint ¶ 40. The Complaint thus asserts a need for "formal discovery" to obtain evidence withheld by the DEA and to further substantiate Barbour's retaliation claim. *Id.*

### B.

Following the exhaustion of her administrative remedies, Barbour initiated this civil action against the DEA on November 18, 2020, in the federal district court in the District of Columbia. The case was subsequently transferred to the Eastern District of Virginia, where, on September 10, 2021, Barbour filed the Complaint alleging the Title VII retaliation claim at issue herein. The DEA responded on September 24, 2021, with its Rule 12(b)(6) motion to dismiss. For reasons more fully discussed below, the district court granted the DEA's motion by the Dismissal Order of June 29, 2022, concluding that "the factual allegations set forth in [the] Complaint fail to raise [Barbour's] right to relief above the speculative level." *See* Dismissal Order 9 (internal quotation marks omitted).

Barbour timely noted this appeal from the district court's judgment. We possess jurisdiction pursuant to 28 U.S.C. § 1291.[4]

---

[4] Although Barbour was represented by counsel in the district court, she filed a pro se notice of appeal. She thereafter retained new lawyers who submitted formal briefs and appeared for oral argument in this Court.

16

## II.

We review de novo a district court's dismissal of a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). *See Fusaro v. Cogan*, 930 F.3d 241, 247-48 (4th Cir. 2019). Again, in conducting such a review, we are obliged to accept the complaint's factual allegations as true and to view them in the light most favorable to the plaintiff. *See Feminist Majority Found. v. Hurley*, 911 F.3d 674, 680 (4th Cir. 2018). That is, we draw all reasonable inferences in the plaintiff's favor. *See Singer v. Reali*, 883 F.3d 425, 437 (4th Cir. 2018). We need not, however, accept as correct the complaint's legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a Rule 12(b)(6) motion, the complaint "must plead 'sufficient factual matter' to 'state a claim to relief that is plausible on its face.'" *See Fusaro*, 930 F.3d at 248 (quoting *Iqbal*, 556 U.S. at 678). "So long as a complaint contains factual allegations that raise a right to relief above the speculative level, thereby nudging the claims across the line from conceivable to plausible, dismissal is improper." *See Laurent-Workman v. Wormuth*, 54 F.4th 201, 210 (4th Cir. 2022) (alteration and internal quotation marks omitted).

## III.

## A.

In Barbour's civil action against the DEA, the Complaint alleges a single claim, for retaliation in violation of Title VII. Pertinent here, Title VII's anti-retaliation provision renders it unlawful for an employer to discriminate against an applicant for employment "because [that applicant] has opposed any practice made an unlawful employment practice

17

by [Title VII]" or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." *See* 42 U.S.C. § 2000e-3(a). The anti-retaliation provision extends to applicants for federal employment through Title VII's federal-sector provision. *See id.* § 2000e-16 (regulating employment by federal government); *see also Laurent-Workman v. Wormuth*, 54 F.4th 201, 212 (4th Cir. 2022) (recognizing that "the anti-retaliation provision's protections are incorporated by the federal-sector provision").

When opposing an employer's summary judgment motion under Federal Rule of Civil Procedure 56, a plaintiff who lacks direct evidence of retaliatory animus may utilize the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to preserve her Title VII retaliation claim. *See Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249-52 (4th Cir. 2015). Under that framework, the plaintiff must first establish a prima facie case of retaliation; the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its allegedly retaliatory action; and finally, the plaintiff must demonstrate that the reason articulated by the employer was not its true reason, but rather a pretext for retaliation. *Id.* at 250. At the initial step, to establish a prima facie case of retaliation, the plaintiff must show: "(1) engagement in a protected activity; (2) [an] adverse employment action; and (3) a causal link between the protected activity and the employment action." *See Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010).

Importantly, however, a Title VII retaliation claim may survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) even if the complaint does not allege facts

18

sufficient to establish the *McDonnell Douglas* framework's prima facie case. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2002). Indeed, there is no requirement that the complaint contain such facts; rather, the ordinary rules apply and the complaint therefore need "contain only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)). That is because the *McDonnell Douglas* framework's prima facie case "is an evidentiary standard, not a pleading requirement." *Id.* at 510. Moreover, "it is not appropriate to require a plaintiff to plead facts establishing a prima facie case because the *McDonnell Douglas* framework does not apply in every employment discrimination case," including those where the "plaintiff is able to produce direct evidence of discrimination." *Id.* at 511 (further highlighting that "discovery might uncover such direct evidence" only after the complaint is filed).

Of course, there being no requirement that the complaint contain facts establishing the *McDonnell Douglas* framework's prima facie case, there also is no requirement that the complaint contain facts rebutting any legitimate, nondiscriminatory reason articulated by the employer for its allegedly retaliatory action. *See Woods v. City of Greensboro*, 855 F.3d 639, 649 (4th Cir. 2017) (explaining that whether the employer's explanation for the action "is in fact pretext is a question to be analyzed under the long-familiar shifting burdens regime of *McDonnell Douglas* . . . , and not under Rule 12(b)(6)"). A complaint thus will survive a Rule 12(b)(6) motion so long as the employer's explanation "does not render [the complaint's] allegations implausible." *Id.* The relevant question is whether the employer's explanation "is so obviously an irrefutably sound and unambiguously

19

nondiscriminatory and non-pretextual explanation that it renders [the plaintiff's] claim of pretext implausible." *Id.*

At bottom, in order to adequately plead a Title VII retaliation claim, the complaint must "allege[] facts supporting a plausible inference that [the employer took an adverse employment action against the plaintiff] 'because' of [the plaintiff's] protected activity." *See Holloway v. Maryland*, 32 F.4th 293, 300 (4th Cir. 2022) (quoting 42 U.S.C. § 2000e-3(a)). Consequently, a claim for retaliatory non-selection will survive a motion to dismiss under Rule 12(b)(6) if the complaint's factual allegations support a plausible inference that the employer did not hire the plaintiff because of her protected activity. *See Laurent-Workman*, 54 F.4th at 218-19 (affirming dismissal of Title VII retaliatory non-selection claim where plaintiff "failed to allege a non-speculative link between her [prior] Title VII claim and her non-selection").

### B.

As explained in the Dismissal Order of June 2022, the DEA conceded in the district court that the Complaint "alleges engagement in a protected activity ([Barbour's] lawsuit regarding dismissal from the FBI Academy) and an adverse action (non-selection by the DEA)." *See* Dismissal Order 4. The DEA contended, however, that the Complaint "does not plead a plausible causal link between the protected activity and the employment action." *Id.* (internal quotation marks omitted). The court agreed with the DEA's contention and dismissed the Complaint, ruling that it "fails to offer anything more than mere speculation to support the conclusion that [Barbour] was denied employment by the DEA in retaliation for her participation in the FBI lawsuit." *Id.*

20

In so doing, the district court rejected Barbour's arguments that the facts alleged in the Complaint support a plausible inference of a causal link between her lawsuit against the FBI and the DEA's subsequent refusal to hire her. *See* Dismissal Order 4-9. As described in the Dismissal Order, the first of those arguments was that "a causal link may be inferred from . . . the temporal proximity of the DEA learning about [Barbour's] lawsuit and [her] non-selection." *Id.* at 4.

With respect to the temporal proximity issue, the district court recognized that "the fact that a protected activity is 'very close' in time to an adverse action may constitute evidence of causation." *See* Dismissal Order 5 (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)). But the court also invoked controlling precedent concluding "that a lapse of three to four months between the employer's knowledge of protected activity and the alleged retaliation is too long to establish a causal connection by tempora[l] proximity alone." *Id.* (quoting *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 127 (4th Cir. 2021)). The court then pointed to the Complaint's allegations that Barbour "disclosed her forthcoming participation in the FBI lawsuit in her April 2019 SF-86 (eight months before her December 2019 non-selection) and discussed the lawsuit extensively in a June 2019 interview (six months before her non-selection)." *Id.* Based on that six- to eight-month lapse between the DEA's knowledge of the FBI lawsuit and the non-selection decision, the court resolved that "temporal proximity alone is insufficient to support an inference of retaliatory causation in this case." *Id.*

Next, wholly apart from its temporal proximity analysis, the district court took up Barbour's "remaining arguments with respect to causation," which the Dismissal Order

21

described as "focus[ing] on purported errors in the reasons offered by the DEA for [Barbour's] non-selection." *See* Dismissal Order 5. That is, the court addressed the four reasons for Barbour's non-selection provided by the DEA in the Kimbell email of January 2020: (1) her discharge from the FBI training; (2) her unreported termination from Grant Thornton LLP; (3) her unreported employment at and firing from Kitchen Kaboodle at age 19; and (4) and her failure to include on the DEA Drug Use Statement her one-time ingestion of Adderall at age 15.

In addressing Barbour's discharge from the FBI training, the district court interpreted the Complaint to "allege[] that decisionmakers at the DEA took her [FBI] dismissal at face value but should have investigated whether the termination from the FBI was due to discrimination." *See* Dismissal Order 5 (internal quotation marks omitted). Having accepted that the DEA sincerely believed that Barbour "was dismissed [from the FBI Academy] for legitimate reasons," the court concluded that "the fact that the DEA could have more fully investigated the basis for the FBI's adverse action does not necessarily establish that the relevant decisionmakers at the DEA were motivated by impermissible retaliatory animus." *Id.* at 6-7.

As for Barbour's supposed termination from Grant Thornton LLP and failure to report it to the DEA, the district court acknowledged that it was constrained to accept the Complaint's allegation that Barbour actually was not terminated from Grant Thornton. *See* Dismissal Order 6. The court resolved to treat this excuse for Barbour's non-selection as "an error" or "mistake of fact." *Id.* at 6-7. Turning to the alleged unreported firing from Kitchen Kaboodle and failure to include the Adderall ingestion on the DEA Drug Use

Statement, however, the court observed that Barbour "effectively concede[d] that [these reasons for her non-selection] are true" and simply sought to downplay their significance. *Id.* (deeming these reasons for the non-selection to be "substantially true, although [Barbour] disagrees with the weight assigned to them by the DEA").

At the close of that discussion of the four reasons for Barbour's non-selection provided by the DEA in the Kimbell email, the district court pronounced that "[n]othing in these facts gives rise to a plausible inference that the DEA did not select [Barbour] because she filed [the FBI] lawsuit." *See* Dismissal Order 7. Invoking precedents involving a summary judgment motion and the *McDonnell Douglas* burden-shifting framework (*Laing v. Federal Express Corp.*) and a post-trial motion for judgment as a matter of law (*DeJarnette v. Corning Inc.*), the court elaborated:

> To the contrary, a Title VII plaintiff may not construct a viable claim for retaliation from the mere fact that an employer made a mistake or the "unexceptional fact that she disagrees with the outcome" of the hiring process. *Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 722 (4th Cir. 2013). Rather, as the Fourth Circuit has made clear, a court in a Title VII action "does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination." *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (citation omitted). Absent any non-speculative basis to conclude that the employer was motivated by retaliatory animus, it is irrelevant whether a plaintiff or a court deems the employer's proffered reasons "wise, fair, or even correct." *Id.*

*See* Dismissal Order 7.

Additionally, the district court ruled that it was "fatal" to Barbour's Title VII retaliation claim that the "Complaint affirmatively pleads legitimate nondiscriminatory reasons for [her] non-selection." *See* Dismissal Order 7. In other words, the Dismissal

23

Order concluded that by acknowledging the DEA's purported reasons for the non-selection, the Complaint pleads Barbour out of court. In support of that conclusion, the Dismissal Order primarily relied on *Bing v. Brivo Systems, LLC*, wherein this Court affirmed the Rule 12(b)(6) dismissal of the race discrimination claim of a pro se plaintiff whose complaint pleaded that he was discharged on his first day on the job for the employer's proffered non-racial reason that, by way of a "Google search," the employer discovered a news article reporting a shooting incident involving the plaintiff's firearm. *See* 959 F.3d 605, 617 (4th Cir. 2020). As was emphasized in *Bing*, the complaint also lacked any factual allegations that supported an inference that the Google search or the discharge was racially motivated. *Id.* at 617-18.

According to Dismissal Order, Barbour similarly "offers nothing more than mere speculation that [the reasons for the non-selection provided in the Kimbell email] were a mask for retaliatory animus," in that "after identifying perceived shortcomings in the DEA's proffered reasons, [the] Complaint states that 'the only possible remaining conclusion is that [the DEA] retaliated against [Barbour].'" *See* Dismissal Order 8 (fourth alteration in original) (quoting Complaint ¶ 39). Put another way by the district court, Barbour merely "posits that her non-selection by the DEA must have been motivated by retaliatory animus." *Id.* at 9. Thereby analogizing this case to *Bing*, the court pronounced that "such speculation cannot rescue a complaint which affirmatively pleads legitimate nondiscriminatory reasons for the employer's action." *Id.* at 8.

Finally, the district court observed that Barbour "fail[ed] to identify any additional facts which would fill the speculative gaps in [the] Complaint." *See* Dismissal Order 9.

24

Accordingly, the court ruled that no "formal discovery" was needed and that the Complaint should be dismissed with prejudice. *Id.* at 9 & n.3 ("[T]he filing of an insufficient complaint does not authorize [Barbour] to engage in 'a fishing expedition to determine if there is any factual basis for asserting' a claim against [the DEA]." (quoting *Johnson v. Am. Towers, LLC*, 781 F.3d 693, 709 (4th Cir. 2015))).

## C.

## 1.

On appeal, Barbour first asserts error in the district court's temporal proximity analysis, which the Dismissal Order limited to the question of whether Barbour could rely on temporal proximity alone to demonstrate a causal link between her lawsuit against the FBI and the DEA's subsequent refusal to hire her. Specifically, Barbour contends that the court erred by ending its analysis with the conclusion that the lapse between the DEA's knowledge of the FBI lawsuit and the non-selection decision — calculated by the court to be a lapse of six to eight months — was too long to establish a causal connection by temporal proximity alone. As set forth below, we agree with Barbour that the court so erred.

## a.

Barbour faults the court for failing to heed the principle that when a Title VII retaliation claimant "cannot rely on mere temporal proximity" as proof of causation, "'courts may look to the intervening period for other evidence of retaliatory animus.'" *See Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007) (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000)). Indeed, as we have explained, a plaintiff

may demonstrate causation by temporal proximity, or by "the existence of facts that suggest that the adverse action occurred because of the protected activity," or by a combination of the two. *See Roberts*, 998 F.3d at 123 (alteration and internal quotation marks omitted). Moreover, "intervening events can bridge what would otherwise be a prohibitively long temporal gap." *See Holloway*, 32 F.4th at 300.

In arguing that the district court erroneously failed to consider other evidence of retaliatory animus, Barbour insists that the Complaint satisfies three methods of pleading causation. *First*, Barbour argues that facts set forth in the Complaint reflect recurring retaliatory animus and conduct during the pertinent six- to eight-month period. *See Lettieri*, 478 F.3d at 650 (specifying that "evidence of recurring retaliatory animus during the intervening period can be sufficient to satisfy the element of causation"). Barbour highlights the Complaint's allegations of the following:

- The repeated and obsessive questioning by DEA background investigators of both Barbour and her sister about the FBI lawsuit and details of the sexual harassment claimed therein;

- The sudden stalling of Barbour's DEA application, despite that it had been expedited and that she had been assured it was ready for the hiring panel's decision;

- The reopening of her background check on dubious pretenses, including that she had failed both to identify a foreign contact (who was actually a U.S. citizen) and to account for a period of unemployment (when, as was already known by the DEA, she was a graduate student);

- The varying information she received about the status of her application and the need to redo the background check;

- The newfound unwillingness of previously helpful DEA human resources contacts to communicate with her; and

26

- The DEA's failure to promptly and voluntarily notify her that her application had been closed and that she was no longer being considered for employment.

*See* Complaint ¶¶ 22, 24-27, 29-30.

Relevant to the DEA background investigators' inquiries into Barbour's FBI lawsuit and sexual harassment allegations, Barbour invokes precedent recognizing that an employer's "intervening comment" about prior protected activity may "temper[] the temporal gap between [that protected activity] and [the later adverse employment action]." *See Holloway*, 32 F.4th at 300. Relevant to the sudden stalling of her application and the reopening of her background check, Barbour invokes precedent recognizing that retaliatory animus during the intervening period may be shown by evidence that the employer took "steps [that] made it easier . . . to take the position later that [the adverse action was justified]." *See Lettieri*, 478 F.3d at 651. And, relevant to the dubious and varying information she received about the status of her application and the need to redo her background check, as well as to the lack of cooperation and communication on the part of DEA officials, Barbour invokes precedent recognizing that being "given the runaround" by the employer may also constitute "sufficient evidence" of causation. *See Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 545 (4th Cir. 2003). Summing up, Barbour asserts that "the probing comments about the lawsuit, the sudden slowdown in her application process, and the reopened background check show precisely the kind of pattern of antagonism that adequately explains the temporal delay." *See* Br. of Appellant 20 (alteration and internal quotation marks omitted).

27

*Second*, Barbour argues that the facts set forth in the Complaint reflect that the DEA rendered its non-selection decision — and thereby retaliated against her for filing the FBI lawsuit — upon the first opportunity to do so. *See Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004) (accepting that a reasonable jury could find retaliatory animus where the employer declined to hire the plaintiff 9 to 10 months after learning of the plaintiff's protected activity, on the basis that the non-selection occurred "at the first available opportunity"). Barbour explains that the decision-making authority rested with the DEA hiring panel, and that therefore "the hiring panel stage presented the DEA's first chance to reject her application." *See* Br. of Appellant 22. Additionally, Barbour emphasizes the Complaint's allegations that "once the hiring panel got hold of [her] application," it "appointed a new background investigator, attempted to find fault with [her] previously cleared background check, and soon thereafter, [rendered its non-selection decision]." *Id.* at 21 (internal quotation marks omitted); *see also* Complaint ¶¶ 24-25, 30-31, 37. According to Barbour, these facts "show that the DEA rejected [her] application at the first opportunity it had." *See* Br. of Appellant 22.

*And third*, Barbour argues that the facts set forth in the Complaint reflect multiple inconsistencies in the DEA's treatment of her application, including inconsistencies in the proffered reasons for her non-selection. *See Farrell*, 206 F.3d at 285-86 (approving use of "inconsistencies in [employer's] explanation [for adverse action]" as evidence of causation); *Martin v. Mecklenburg Cnty.*, 151 F. App'x 275, 280-81 (4th Cir. 2005) (unpublished) (same for adverse action taken by decisionmaker "in violation of well-established policy"). On that score, Barbour relies on the Complaint's pretext allegations

28

to support a plausible inference of causation. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) (explaining that "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive"); *see also Holloway*, 32 F.4th at 300 (counting pretext allegations among facts that supported plausible inference of causation).

Echoing the Complaint, Barbour identifies the following inconsistencies in the proffered reasons for her non-selection, as outlined in the Kimbell email:

- Although the "primary rationale for rejecting [her] was her termination from the FBI," she had "disclosed that termination to the DEA *before* she even applied," the DEA thereafter "invited her to apply . . . anyway," and it "apparently did not view the termination as an impediment to employment," in that she passed her original background check and her application was advanced to the hiring panel;

- The excuse that she had been terminated from her position at Grant Thornton LLP (and failed to report that termination on her SF-86) rested on a "false" factual premise, as she "was *not* terminated from her previous position at Grant Thornton and thus had no termination to report"; and

- Any reliance on her ingestion of Adderall without a prescription as a teenager was contrary to "DEA hiring practices," and any reliance on her failure to report the Adderall ingestion on her DEA Drug Use Statement was undermined by the fact that she nonetheless "passed the background check" and her application "proceeded to the hiring panel."

*See* Br. of Appellant 24-26; *see also* Complaint ¶¶ 14-15, 24, 31-32.[5]  Barbour thereby asserts that the proffered reasons for the non-selection were inconsistent with the DEA's treatment of her application before it reached the hiring panel, inconsistent with the true facts, and inconsistent with DEA policy and usual practices.

As an additional inconsistency in the DEA's treatment of her application, Barbour points to the Complaint's allegations of significant disparities between the proffered reasons for her non-selection as a DEA Special Agent and the misconduct of the other four unsuccessful applicants around the same time.  *Cf. Martin*, 151 F. App'x at 280-81 (recognizing that punishment of plaintiff but not another employee for same misconduct constituted evidence that plaintiff's punishment was retaliatory).  Barbour reiterates that the other unsuccessful "applicants were rejected for repeatedly breaking laws prohibiting the solicitation of prostitution; being discharged from the Army National Guard for continuous and willful absence; having numerous delinquent financial accounts, unpaid taxes, and unsatisfied child support payments; and [having suspicious results] regarding illegal drugs in a polygraph."  *See* Br. of Appellant 26 (internal quotation marks omitted) (citing Complaint ¶ 40).  In Barbour's words, the reasons proffered by the DEA for her non-selection "simply do not compare."  *Id.*

---

[5] Notably, the Complaint also alleges that both the Adderall ingestion and the Kimbell email's remaining reason for the non-selection — Barbour's unreported firing from Kitchen Kaboodle as a teenager — were too long ago to fall within the scope of the background investigation.  *See* Complaint ¶ 32(b)-(c).

Although Barbour suggests that any one of the three foregoing methods of pleading causation — recurring retaliatory animus and conduct, retaliation at the first opportunity, and inconsistencies in the treatment of her application — is sufficient on its own to rule in her favor, she recognizes the appropriateness and helpfulness of considering them "*together*." *See* Br. of Appellant 27. And she insists that when viewing the "Complaint as a whole, as the Court must, [she] has clearly pled facts that support a plausible inference of retaliation." *Id.* at 28.

b.

We agree with Barbour that the district court erred in in its Dismissal Order by failing to consider "other evidence of retaliatory animus" once it determined that Barbour could not rely on temporal proximity alone to support a plausible inference of a causal link between her lawsuit against the FBI and the DEA's subsequent refusal to hire her. *See Lettieri*, 478 F.3d at 650 (internal quotation marks omitted). We also agree with Barbour that the Complaint's allegations of recurring retaliatory animus and conduct, retaliation at the first opportunity, and inconsistencies in the treatment of her application are wholly sufficient, viewed together, to support such a plausible inference — whether or not any one of those methods of pleading causation would be adequate on its own. *See Holloway*, 32 F.4th at 300 (citing consideration of "the timing, [the employer's] intervening statement, and . . . allegations of pretext together" in concluding that the plaintiff "alleged facts supporting a plausible inference that he was terminated because of his protected activity" (internal quotation marks omitted)); *Farrell*, 206 F.3d at 283-86 (ruling that the plaintiff could and did "illustrate a causal link for purposes of establishing retaliation" by "rely[ing]

31

upon a broad array of evidence," including "inconsistencies [the plaintiff] raised in [the employer's] explanation for her termination" (internal quotation marks omitted)); *Martin*, 151 F. App'x at 281 (concluding that a reasonable jury could find retaliatory animus based on evidence that the adverse action was "inconsistent" with the treatment of a similarly situated employee, taken "in violation of well-established policy," and "rendered at the first opportunity after becoming aware of [the plaintiff's] protected conduct").

None of the DEA's arguments on appeal convince us otherwise. For example, instead of merely endorsing the district court's ruling that the lapse between the DEA's knowledge of the FBI lawsuit and the non-selection decision was too long to help Barbour demonstrate causation, the DEA goes further and contends that insufficient temporal proximity can be used against Barbour to disqualify her retaliation claim regardless of other evidence of retaliatory animus. *See, e.g.*, Br. of Appellee 14 (asserting that insufficient temporal proximity "is fatal to Barbour's claim"). To support its contention, the DEA invokes our 2021 decision in *Roberts*. But *Roberts* involved review of a summary judgment award and even then recognized that "a years-long gap" — far longer than the six- to eight-month lapse calculated by the district court in this case — would serve only as evidence "tend[ing] to prove the opposite" of "a strong inference of retaliation." *See* 998 F.3d at 127. Moreover, *Roberts* reiterated the principle that, where temporal proximity is lacking, the plaintiff may yet prove causation with some other evidence of retaliatory animus. *See id.* As such, *Roberts* in no way substantiates the DEA's contention that insufficient temporal proximity can serve as an automatic bar to a retaliation claim.

Meanwhile, the DEA ratifies the district court's view that the DEA's knowledge of the FBI lawsuit dates to Barbour's April 2019 SF-86 or at least to the June 2019 background investigator interview — and not, as the Complaint suggests, to the original background investigator's subsequent briefing of the decision-making DEA hiring panel as late as September 2019. Nevertheless, the DEA argues that because the decisionmaker was the hiring panel, rather than the original or any other background investigator, we cannot consider the different background investigators' repeated and obsessive questions about the FBI lawsuit to be the DEA's intervening comments about Barbour's protected activity. Thus, the DEA asserts on the one hand that the original background investigator's knowledge of the FBI lawsuit constitutes the DEA's knowledge of the lawsuit, but on the other hand that the background investigator interrogations about the FBI lawsuit cannot be attributed to the DEA.

With further respect to Barbour's theory of recurring retaliatory animus and conduct, the DEA faults the Complaint for failing to name each background investigator and other DEA official and employee involved in the events leading to the non-selection; to specify the roles of those persons and their influence on the decision-making process; to identify which of them (other than the background investigators) knew of the FBI lawsuit; and to explicitly allege that any of them was acting on the direction of the DEA hiring panel. Without such details, according to the DEA, the Complaint does not "suggest anything, good or bad, about the propriety of any of the[] events" leading to the non-selection, and "it is equally plausible that the alleged retaliatory events are normal issues that can arise in the hiring process." *See* Br. of Appellee 18.

33

The DEA also would have us reject Barbour's theory that the non-selection occurred at the first opportunity, by inferring from the Complaint that there were "multiple other points in the application process at which the DEA could have retaliated against [Barbour] had it been inclined to do so." *See* Br. of Appellee 22. And the DEA would have us disregard Barbour's theory of inconsistencies in the treatment of her application because, inter alia, the Complaint does not name and state the precise terms of "any DEA policy of which her application process ran afoul." *See id.* at 24, 26 (further criticizing the Complaint for relying on Barbour's "subjective expectations" and "subjective evaluation of the merits of DEA's decision-making," including her mere opinion "that the reasons other applicants were rejected in her application cycle 'simply do not compare' to the reasons she was not selected by the DEA").

All told, what the DEA promotes is a reading of the Complaint and the imposition of a stringent pleading standard that favors the DEA over Barbour at just about every turn. But that is contrary to the clear and controlling precedents, which require us to draw all reasonable inferences in Barbour's favor, and which oblige Barbour only to plead enough facts to render it plausible that the DEA refused to hire her as a Special Agent because of her lawsuit against the FBI. *See Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015) ("To survive a motion to dismiss, a plaintiff need not demonstrate that her right to relief is probable or that alternative explanations are less likely; rather, she must merely advance her claim 'across the line from conceivable to plausible.'" (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007))). Viewed in the proper light, the

34

Complaint is entirely sufficient to satisfy Barbour's obligation at this early stage of the proceedings.

2.

That brings us to Barbour's remaining assertions of error in the Dismissal Order, which largely relate to the district court's analysis of the Complaint's allegations regarding the reasons given by the DEA for Barbour's non-selection as a Special Agent. Specifically, Barbour argues that the court erred by (1) failing to view the relevant allegations of the Complaint in the light most favorable to her; (2) effectively requiring her to rebut the DEA's proffered reasons for the non-selection and prove pretext at the Rule 12(b)(6) motion to dismiss stage; (3) ruling that she pleaded herself out of court by acknowledging the DEA's purported justifications; and (4) ending the proceedings without allowing her discovery. We conclude that each of those contentions is meritorious.

*First*, in recognizing that the district court took an erroneous view of the Complaint, we recount the Complaint's allegations that the DEA's proffered reasons for the non-selection were, inter alia, "controversial at the very least" but left uninvestigated (Barbour's discharge from the FBI training), "completely false" (her purported termination from Grant Thornton LLP), "simply frivolous" (her unreported employment at and firing from Kitchen Kaboodle at age 19), and "the most disconcerting lie" (the suggestion that she was required to report her one-time ingestion of Adderall at age 15 and that, because she omitted it from the DEA Drug Use Statement, she failed to ever report it to the DEA at all). *See* Complaint ¶¶ 32(a)-(c), 39. Fairly construed, the Complaint reflects that the DEA refused to hire Barbour in retaliation for her lawsuit against the FBI and then, in a deliberate effort to

35

conceal its retaliatory animus, falsely blamed Barbour's non-selection on the underlying FBI discharge — neither knowing nor caring whether it was actually legitimate — and on the three other "provably wrong" and "irrelevant" excuses. *See id.* ¶ 31.

Pursuant to the district court's interpretation of the Complaint, however, the DEA took the FBI discharge "at face value" and sincerely believed it was justified and nondiscriminatory. *See* Dismissal Order 5-7. The court also gleaned from the Complaint that the DEA's reliance on the purported Grant Thornton termination was an "error" or "mistake of fact," and that the Kitchen Kaboodle and Adderall issues were "substantially true" reasons for the non-selection that the DEA merely gave more weight than Barbour thought they deserved. *Id.* at 6-7. From there, the court concluded that the Complaint alleges only an innocent mistake by the DEA, along with true issues on which the DEA made permissible judgment calls, that cannot give rise to a plausible inference of retaliation. *Id.* at 7.

In Barbour's words, the Dismissal Order thereby viewed the Complaint's "allegations in a light *least* favorable to [her]." *See* Br. of Appellant 35 (emphasis added). And to be sure, the district court failed to draw all reasonable inferences in Barbour's favor and contravened the applicable standard for viewing the Complaint. *See Feminist Majority Found. v. Hurley*, 911 F.3d 674, 680 (4th Cir. 2018); *Singer v. Reali*, 883 F.3d 425, 437 (4th Cir. 2018).

*Second*, in ruling that the district court erred by effectively requiring Barbour to rebut the DEA's proffered reasons for the non-selection and prove pretext at the Rule 12(b)(6) stage, we adhere to the authorities holding that a Title VII retaliation claim may

36

survive a motion to dismiss even if the complaint does not allege facts that would later be sufficient to survive a summary judgment motion under the *McDonnell Douglas* burden-shifting framework. *See Swierkiewicz*, 534 U.S. at 508; *Woods*, 855 F.3d at 649. At the Rule 12(b)(6) stage, the plaintiff need only allege sufficient facts to support a plausible inference of a causal link between the adverse action and the plaintiff's prior protected activity. *See Holloway*, 32 F.4th at 300. That does not mean, however, that allegations of pretext are irrelevant at the Rule 12(b)(6) stage; rather, they can be used to demonstrate causation. *See id.*

Here, Barbour appropriately relies on the Complaint's pretext allegations — i.e., the allegations of inconsistencies in the DEA's proffered reasons for refusing to hire her — to contribute to a plausible inference of a causal link between her non-selection by the DEA and her lawsuit against the FBI. *See* Br. of Appellant 32 (asserting that "Barbour's allegations of pretext, together with the DEA's change in behavior after learning about her [FBI] lawsuit, support a plausible claim of retaliation"). Nonetheless, as Barbour contends, the district court apparently misapprehended Barbour's burden and the role of her pretext allegations at the Rule 12(b)(6) stage. That is, the court seemed to improperly require Barbour to rebut the DEA's proffered reasons and prove pretext, as evidenced by the court's reliance on decisions at the summary judgment stage and beyond to disapprove the Complaint's pretext allegations. *See, e.g.*, Dismissal Order 7 (invoking this Court's decision in *Laing*, involving summary judgment and the *McDonnell Douglas* burden-shifting framework, for the proposition that "a Title VII plaintiff may not construct a viable claim for retaliation from the mere fact that an employer made a mistake or the

37

'unexceptional fact that she disagrees with the outcome' of the hiring process" (quoting *Laing*, 703 F.3d at 722)).

*Third*, in concluding that the district court erred in ruling that Barbour pleaded herself out of court by acknowledging the DEA's proffered reasons for her non-selection, we recognize that it is possible for a Title VII plaintiff to plead herself out of court by identifying a legitimate and nondiscriminatory reason for the employer's adverse action. *See Bing*, 959 F.3d at 617. We further observe, however, that such doomed pleading will happen only if the complaint fails to allege any other facts that support a plausible inference of causation. *See id.* at 617-18. Indeed, the complaint will not be dismissed unless the employer's explanation "is so obviously an irrefutably sound and unambiguously nondiscriminatory and non-pretextual explanation that it renders [the plaintiff's] claim of pretext implausible." *See Woods*, 855 F.3d at 649.

Again, viewed in the light most favorable to Barbour, the Complaint plausibly alleges that the DEA concocted legitimate-looking excuses for its refusal to hire her — one based on a lie, the others based in fact, and none the real reason for the non-selection. The DEA's proffered reasons for the non-selection therefore are neither "irrefutably sound" nor "unambiguously nondiscriminatory and non-pretextual." *See Woods*, 855 F.3d at 649. Because it erroneously failed to take this view of the Complaint, the district court committed the further error of ruling that Barbour pleaded herself out of court.

In so saying, we emphasize that it matters not that some of the DEA's proffered reasons were grounded in truth and that Barbour actually was discharged from the FBI training, was also fired from Kitchen Kaboodle, and failed to report her one-time Adderall

38

ingestion on the DEA Drug Use Statement. For, as we have cautioned, when other facts indicate that "the employer was simply looking for a reason to get rid of the employee" — or, as here, to deny the plaintiff employment — "the employer's proffered explanation may not be worthy of credence." *See Cowgill v. First Data Techs., Inc.*, 41 F.4th 370, 383 (4th Cir. 2022) (alterations and internal quotation marks omitted) (observing that the evidence there suggested that the employer "searched for and found the single nugget of misconduct that allowed it to . . . set the course for termination"); *see also Miller v. Md. Dep't of Nat. Res.*, 813 F. App'x 869, 871-72, 879 (4th Cir. 2020) (unpublished) (concluding that, even though plaintiff admitted using unauthorized resources during employment-related exam, employer's accusation of "cheating" could be seen as pretext for retaliation in light of other facts).

It also merits discussion that, in ruling that Barbour pleaded herself out of court, the Dismissal Order honed in on the Complaint's allegation that — once the DEA's proffered reasons for the non-selection are discounted — "the only possible remaining conclusion is that [the DEA] retaliated against [Barbour]." *See* Dismissal Order 8 (first alteration in original) (quoting Complaint ¶ 39). The district court rejected that allegation as "speculation" that could not save the Complaint, having already erroneously deemed the Complaint's pretext allegations to be unavailing. *Id.* Meanwhile, as it did in its temporal proximity analysis, the court improperly disregarded all other allegations in the Complaint — those concerning recurring retaliatory animus and conduct, retaliation at the first opportunity, and the balance of the inconsistencies in the treatment of Barbour's application — that support a plausible inference of causation.

39

*Fourth*, in lastly observing that the district court erred by ending the proceedings without allowing Barbour discovery, we reiterate that the allegations of the Complaint are wholly sufficient to survive the DEA's Rule 12(b)(6) motion. As the court would have it, Barbour's request for discovery amounts to nothing more than an entreaty for an unwarranted "fishing expedition." *See* Dismissal Order 9 n.3 (internal quotation marks omitted). We see it differently and agree with Barbour that she is entitled and it is time to "proceed to the merits of [her Title VII retaliation] claim, starting with discovery." *See* Br. of Appellant 40.[6]

IV.

Pursuant to the foregoing, we reverse the district court's judgment of dismissal and remand for such other and further proceedings as may be appropriate.

*REVERSED AND REMANDED*

---

[6] On a final note, in addition to unpersuasively endeavoring to defend the Dismissal Order, the DEA asserts that Barbour forfeited certain of her appellate arguments by failing to make them in the district court. We disagree with the DEA, as those arguments do not constitute new "issues" that we would generally decline to address. *See Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 603 (4th Cir. 2004) (explaining that "[a]bsent exceptional circumstances, of course, we do not consider issues raised for the first time on appeal"). Rather, they are simply "variations" on the arguments that Barbour advanced in the district court on "the same fundamental question" presented in this appeal: whether the Complaint adequately alleges causation. *See United States v. Boyd*, 5 F.4th 550, 556 (4th Cir. 2021) (recognizing that "variations on arguments made below may be pursued, so long as the appealing party asked both courts to evaluate the same fundamental question" (internal quotation marks omitted)).

RUSHING, Circuit Judge, dissenting:

The majority concludes that Gabrielle Barbour plausibly alleged that a DEA hiring panel refused to hire her because she was suing the FBI for sexual harassment. Because Barbour's complaint contains virtually no allegations concerning the conduct or motivations of the hiring panel, I respectfully dissent.

To survive the DEA's motion to dismiss, Barbour was required to plausibly allege that the "'actual decisionmaker'" responsible for her adverse employment action was motivated by retaliatory animus. *Bandy v. City of Salem*, 59 F.4th 705, 710 (4th Cir. 2023) (quoting *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 288–289 (4th Cir. 2004) (en banc), *abrogated in part on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009)); *see also*, *e.g.*, *Krehbiel v. BrightKey, Inc.*, No. 22-1385, 2023 WL 7984747, at *1 (4th Cir. Nov. 17, 2023) (per curiam) (affirming dismissal of Title VII claim on this basis).

Barbour claims "the DEA retaliated against her through its *hiring panel*." Reply Br. 12–13 (noting that "the hiring panel, which is tasked with the ultimate hiring decision, was responsible for deciding not to hire Barbour" (internal quotation marks omitted)). Since the hiring panel is the "decisionmaker alleged to harbor retaliatory animus," Barbour had to allege facts raising the plausible inference that the hiring panel—not other individuals associated with the hiring process—was motivated by retaliatory animus. Reply Br. 13 (emphasis omitted) (urging the Court to focus on the actual decisionmaker, the hiring panel, not "*all* of the DEA employees" involved in the process).

41

Barbour's complaint contains the following allegations about the hiring panel. On August 30, 2019, Barbour was "told by the DEA that . . . she is on to the hiring panel." J.A. 11. On December 10, the hiring panel, which was aware of her pending lawsuit against the FBI, decided not to hire Barbour and four other applicants. J.A. 13, 16. On January 6, 2020, Barbour received a letter identifying four reasons why the hiring panel declined to hire her, none of which referenced the lawsuit.[1] J.A. 13.

These allegations do not raise a plausible inference of retaliation. *See McCleary-Evans v. Md. Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 588 (4th Cir. 2015) (A "complaint must allege more than a sheer possibility that a defendant has acted unlawfully." (internal quotation marks omitted)). The hiring panel may have known about Barbour's protected activity. "Knowledge alone, however, does not establish a causal connection between [Barbour's] protected activity and [the hiring panel's] decision not to hire" her. *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013). The hiring panel may have taken three months to reach its decision and declined to immediately inform Barbour, but there is no allegation that this timeframe is unusual for the panel, much less so unusual that it could somehow form the basis of a retaliation claim. *Cf. Holloway v. Maryland*, 32 F.4th 293, 300 (4th Cir. 2022) ("[A] three-month period between the

___

[1] The majority also references Barbour's assertion "upon information and belief" that "sexually explicit facts" about her harassment lawsuit were not "known to the decision maker until December 10, 2019." J.A. 11; *see* Maj. Op. 11 n.3. This assertion, unsupported by any factual allegations, does not change the analysis.

protected activity and the adverse action, without more, does not support a finding that there is a causal link." (internal quotation marks omitted)). And the hiring panel's reasons for not selecting Barbour do not mention her protected activity. *See id.* (noting that "supervisors' repeated comments regarding the protected activity" can be relevant (brackets omitted)).

Barbour advances three inferences to fill the plausibility "gaps" in her complaint. *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 618 (4th Cir. 2020) (internal quotation marks omitted). First, Barbour alleges purportedly retaliatory statements and conduct by other individuals associated with the DEA hiring process. But we have "disavowed a test that would impute the discriminatory motivations of subordinate employees having no decisionmaking authority to the employer, [even when those employees] have influence or even substantial influence in effecting a challenged decision." *Roberts v. Gestamp W. Va., LLC*, 45 F.4th 726, 739 (4th Cir. 2022) (internal quotation marks and ellipsis omitted); *see also Song v. Becerra*, No. 20-1554, 2021 WL 3732961, at *2 (4th Cir. Aug. 24, 2021) (per curiam) (affirming dismissal of discrimination claim because "'[s]tatements by nondecisionmakers . . . do not suffice to satisfy the plaintiff's burden of proving discrimination'" (quoting *Hill*, 354 F.3d at 286)). Barbour would need to plausibly allege that the *hiring panel* was implicated in this purportedly retaliatory conduct.

Barbour's complaint does not allege that the hiring panel was responsible for any of the conduct she imputes to it on appeal. There is no allegation that the unidentified persons who reopened her background check were ordered to do so by the hiring panel. There is no allegation that the hiring panel selected the background investigators or controlled their

43

questioning.  And there is no allegation that the hiring panel directed certain unidentified employees to give Barbour conflicting information about her application, while directing two other employees to stop responding to her emails.  Indeed, the complaint affirmatively indicates that the hiring panel was not responsible for some of this conduct.  For example, Barbour alleges that a background investigator was already "obsessively question[ing] her about the lawsuit" in mid-June 2019, months before the hiring panel became involved in the process.  J.A. 11; *see also* Reply Br. 13 (insisting that the hiring panel "could not have" retaliated against Barbour prior to August 2019 "for the simple reason that [this timeframe] preceded the hiring panel's review").

Nor can we plausibly infer—from timing alone—that the hiring panel orchestrated all this from the shadows.  Perhaps it did.  We "can only speculate." *McCleary-Evans*, 780 F.3d at 586.  And that speculative possibility is not enough.  This Court does not "allow a complaint to survive a motion to dismiss [simply because] the pleadings [leave] open the *possibility* that a plaintiff might later establish some set of undisclosed facts to support recovery." *Id.* at 587 (internal quotation marks and brackets omitted).

Second, Barbour argues we can plausibly infer retaliation because the hiring panel "rejected [her] application at the first opportunity it had," Opening Br. 22, namely, at a "natural decision point" in December 2019, Reply Br. 6 (internal quotation marks omitted). To support this puzzling argument—which suggests that an unbiased hiring panel would have waited for an "[un]natural decision point"—Barbour cites to three of our cases involving what she terms "retaliation at the first opportunity."  Opening Br. 27; *see also* Opening Br. 20–23 (citing *Price*, 380 F.3d 209, *Templeton v. First Tenn. Bank, N.A.*, 424

44

Fed. App. 249 (4th Cir. 2011) (per curiam), *Martin v. Mecklenburg Cnty.*, 151 Fed. App. 275 (4th Cir. 2005) (per curiam)).

We discussed "*adverse action* taken at the first opportunity" in *Price v. Thompson*. 380 F.3d at 213 (emphasis added).  There, we "assume[d], without deciding, that in the failure-to-hire context, the employer's knowledge coupled with an adverse action taken at the first opportunity satisfies the causal connection element of the prima facie case." *Id. Price*'s reluctance to bind future panels to such a rule was warranted.  "Knowledge alone" cannot establish causation. *Porter v. Bd. of Trs. of N.C. State Univ.*, 72 F.4th 573, 582 (4th Cir. 2023) (internal quotation marks omitted).  Yet this rule would suggest that knowledge alone *is* sufficient.  Suppose a job candidate engages in protected activity at some point and later submits an application to an employer who makes hiring decisions every six months.  According to Barbour, if the decisionmaker rejects the application six months later and *knows* about the protected activity, a plausible inference of retaliation would arise. *See* Opening Br. 20 (calling this an "independent ground that satisfies the causation element").  We have never countenanced such speculation, and the majority correctly declines to do so today. *See* Maj. Op. 31.

Unfortunately, the majority never explains what its alternative—"retaliation at the first opportunity"—means.  Maj. Op 31.  Thankfully, our prior decisions do.  In *Templeton v. First Tennessee Bank, N.A.*, we indicated that when an applicant is "retaliated against, if at all, upon the employer's first opportunity to do so," the "mere lapse in time between the protected activity and the adverse employment action does not *inevitably foreclose* a finding of causality."  424 Fed. App. at 251 (emphasis added) (internal quotation marks

omitted).  Rather, the plaintiff can still prevail on the motion to dismiss if she alleges "other relevant evidence" giving rise to a plausible inference of retaliation.  *Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007); *see, e.g.*, *Martin*, 151 Fed. App. at 281 ("A decisionmaker's *inconsistent action* in violation of *well-established policy*, rendered at the first opportunity after becoming aware of protected conduct, provides sufficient evidence for" inferring retaliation. (emphasis added)).

In *Templeton*, for example, the plaintiff alleged she had complained to the company president about sexual harassment; resigned her employment after accusing management of failing to protect her from the harassment and subsequent retaliation; expressed interest in returning two years later; and learned that the company president, shortly after hearing about her potential return, "had accused her of having 'issues with management' and had stopped the rehiring process."  *Templeton v. First Tenn. Bank, N.A.*, No. CIV.WDQ-09-3280, 2010 WL 2292493, at *1 (D. Md. June 3, 2010); *see also Templeton*, 424 Fed. App. at 251.  Considered together, these allegations nudged the retaliation claim from conceivable to plausible.  *Templeton*, 424 Fed. App. at 251.

In sum, retaliation at the first opportunity requires evidence of *retaliation*.  Adverse action at the first opportunity is not enough to state a retaliation claim.  Even assuming, therefore, that the hiring panel rejected Barbour's application at the first opportunity, that would at most establish that her claim is not "inevitably foreclose[d]" by the temporal delay in this case.  *Id.* (internal quotation marks omitted).  She still needs to allege evidence of retaliation.

Third and finally, Barbour alleges the hiring panel's reasons for her non-selection were "false, and . . . controversial at the very least," so the "only possible remaining conclusion is that they retaliated against Plaintiff because she was suing a sister Justice Department Agency." J.A. 16. A plaintiff cannot create a plausible inference of retaliation simply by alleging that an employer's reasons for not hiring her were mistaken or unfair. "The crucial issue in a Title VII action is an unlawfully discriminatory motive for a defendant's conduct, not the wisdom or folly of its business judgment." *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 269 (4th Cir. 2005) (internal quotation marks omitted). Since Title VII does not authorize courts to "declare unlawful every arbitrary and unfair employment decision," *Balazs v. Liebenthal*, 32 F.3d 151, 159 (4th Cir. 1994) (internal quotation marks omitted), "unfair" decisions, *Bing*, 959 F.3d at 617, and decisions reflecting "mere mistakes of fact" are insufficient to state a claim, *Price*, 380 F.3d at 214 & n.1.[2]

---

[2] Barbour and the majority criticize the district court for citing "decisions at the summary judgment stage and beyond" "involving . . . the *McDonnell Douglas* burden-shifting framework." Maj. Op. 37. But that practice isn't a problem when, as here, the cited legal principles apply across all procedural stages of a case. The majority itself relies extensively upon decisions at the summary judgment stage and beyond applying the *McDonnell Douglas* framework. *See* Maj. Op. 25–27, 31 (citing *Lettieri*, 478 F.3d 640); Maj. Op. 25, 28, 31–32 (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271 (3d Cir. 2000)); Maj. Op. 26 (citing *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111 (4th Cir. 2021)); Maj. Op. 27 (citing *Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536 (4th Cir. 2003)); Maj. Op. 28 (citing *Price*, 380 F.3d 209); Maj. Op. 28, 30, 32 (citing *Martin*, 151 Fed. App. 275); Maj. Op. 29 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000)); Maj. Op. 39 (citing *Cowgill v. First Data Techs., Inc.*, 41 F.4th 370 (4th Cir. 2022)).

Rather than weighing the "prudence of employment decisions" by asking whether an employer's reasons were unfair or mistaken, *Anderson*, 406 F.3d at 272 (internal quotation marks omitted), our cases have considered whether the employer's explanations are "inconsistent," *Lyons v. City of Alexandria*, 35 F.4th 285, 292–293 (4th Cir. 2022). Inconsistencies can raise pretext concerns and may be assessed without exceeding our statutory authorization by wading into the "wisdom or folly" of business judgments. *Anderson*, 406 F.3d at 269 (internal quotation marks omitted). Barbour appears to grasp the distinction. Her complaint alleged that the hiring panel's four reasons for her non-selection were "frivolous," "not credible," "false," "not true," "controversial," "minor," "irrelevant," under-investigated, and not taken "with a grain of salt." J.A. 13–16. Her appellate briefing now reframes the hiring panel's reasons as "inconsistent." Opening Br. 25. They are not.

None of the explanations given by the hiring panel create a plausible inference of retaliation.[3] According to Barbour, the hiring panel's "primary rationale" for her non-

---

[3] Barbour and the majority fault the district court for "requiring Barbour to rebut the DEA's proffered reasons for the non-selection and prove pretext at the Rule 12(b)(6) stage." Maj. Op. 36. That's not what the district court did. It was Barbour, not the district court, who made her claim turn on the hiring panel's reasons for her non-selection. She alleged that "an inference of relation [sic] is created sufficient to state a *prima facie* case given the pretextual nature of the . . . justifications for the action." J.A. 18; *see also* J.A. 13–16 (relying on the "pretextual nature of these alleged justifications"). The district court found that "[n]othing in [the DEA's justifications] gives rise to a plausible inference that the DEA did not select Plaintiff because she filed a lawsuit." *Barbour v. Garland*, No. 1:21-CV-883, 2022 WL 3053765, at *4 (E.D. Va. June 29, 2022). There was no burden placed on Barbour to rebut the hiring panel's reasons. *She* argued the hiring panel's reasons supported a plausible inference of retaliation, and the district court disagreed. That is the relevant portion of the analysis. Barbour and the majority object to the district court's (Continued)

selection, Opening Br. 24, was that she had been "removed from the FBI Training Academy for insubordination and failure to follow rules," J.A. 39. That reason is factually accurate. The FBI did remove Barbour, citing these reasons. Barbour alleges that owing to her pending lawsuit, the hiring panel had an "obligation" to either investigate whether the FBI was correct "or at least consider [her termination] 'with a grain of salt.'" J.A. 15. But "Title VII protection from retaliation for filing a complaint does not clothe the complainant with immunity for past and present inadequacies" or "unsatisfactory performance." *Couch v. Am. Bottling Co.*, 955 F.3d 1106, 1109 (8th Cir. 2020) (internal quotation marks omitted); *see also Jenkins v. Hous. Ct. Dep't*, 16 F.4th 8, 15 (1st Cir. 2021) (same); *Villa v. CavaMezze Grill, LLC*, 858 F.3d 896, 902 (4th Cir. 2017) (Title VII retaliation protection "was not intended to immunize insubordinate, disruptive, or nonproductive behavior." (internal quotation marks omitted)). Barbour cannot plausibly allege pretext, much less retaliation, whenever an employer cites her "unsatisfactory performance" at the FBI.

Perhaps recognizing this, Barbour argues that the hiring panel's reliance on her FBI termination is "inconsistent" because she was invited to apply to the DEA, passed her background check, and advanced to the hiring panel, despite having disclosed her termination at the outset. If the hiring panel did not care about the FBI termination before her lawsuit, why did it care after the lawsuit? This doesn't show inconsistency "for the

---

additional rationale that Barbour "pleaded herself out of court," Maj. Op. 38, but that further holding is irrelevant here. Barbour alleges the hiring panel's reasons *support* a plausible inference of retaliation—that is the question we are addressing.

simple reason that [these events] preceded the hiring panel's review." Reply Br. 13. The hiring panel did not say one thing and then the opposite. *See Lyons*, 35 F.4th at 292 ("[A]n employer's multiple reasons do not create the inference of pretext where there has been no retraction of any of its reasons nor are any of its reasons inconsistent or conflicting." (internal quotation marks and ellipsis omitted)). It said one thing: Barbour should not be hired because she was terminated from the FBI for insubordination and failure to follow rules. Because this rationale for Barbour's non-selection was factually accurate and not inconsistent, we cannot infer pretext from it, much less retaliation.

Nor can we plausibly infer retaliation from the other reasons given by the hiring panel. The panel noted Barbour had "ingested Adderall without a prescription in High School" and failed to disclose this on her DEA Drug Use Statement. J.A. 39. That is also factually accurate. Barbour alleges her drug use was "out of the scope of consideration" because of when it occurred, but nothing she cites supports this contention. J.A. 14. Barbour also alleges it would be unfair for the hiring panel to cite her failure to report her drug use because she disclosed it later in the application process. However, Barbour "cannot establish her own criteria for judging her" application. *Anderson*, 406 F.3d at 269. And we are not concerned with whether the hiring panel's sensitivity to initially undisclosed drug use conforms with our sense of fairness.

The hiring panel also noted that Barbour was "removed from [her] position at Grant Thornton LLP for not meeting expectations of performance" and was "involuntarily terminated from [her] position at Kitchen Kaboodle for being unable to take direction" and had failed to disclose "this employment and the reason for termination." J.A. 39. The

50

former is allegedly false. She was not fired from Grant Thornton. The latter is largely true. She was terminated from Kitchen Kaboodle and did fail to report this, but she claims that her firing was not for "performance reasons," Reply Br. 22, and that "selling pots and pans" is "hardly relevant to the work of a DEA Special Agent," Opening Br. 33. Again, we "do not sit as a super-personnel department weighing" whether involuntary termination from a prior job is relevant to DEA employment. *Anderson*, 406 F.3d at 272 (internal quotation marks omitted). And Barbour cannot infer pretext, much less retaliation, from the fact that one of four reasons was inaccurate and another was partially inaccurate.

Lastly, Barbour alleges that the four reasons given for her non-selection "simply do not compare" to the reasons the "other four applicants" were not selected. Opening Br. 26. Barbour would have us place ourselves in the shoes of the hiring panel members, imagine what their hiring criteria might be, and apply that imagined criteria to infer that being "removed from the FBI Training Academy [in 2018] for insubordination," J.A. 39, does not compare to, for example, being "discharged from the Army National Guard in 2014 for . . . continuous and willful absence," J.A. 16. And from there, Barbour would have us infer that the reasons for non-selection are so incongruous that they give rise to a plausible inference of retaliation. There are no "facts to support this conjecture." *Bing*, 959 F.3d at 618. Believing you are better qualified than other applicants and "guessing that [a hiring decision] is [discriminatorily] motivated does not amount to pleading actual facts to support a claim." *Id.*

51

\*     \*     \*

The "'sheer possibility'" that the hiring panel acted unlawfully is insufficient to state a retaliation claim against the DEA. *McCleary-Evans*, 780 F.3d at 588 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The district court rightly dismissed this complaint. Therefore, I respectfully dissent.